IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

| | | |
|---|---|---|
| EURO SME SDN BHD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 22-00108 |
| | ) | PUBLIC VERSION |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| POLYETHYLENE RETAIL CARRIER | ) | |
| BAG COMMITTEE, HILEY POLY CO., | ) | |
| LLC, and SUPERBAG CORPORATION, | ) | |
| | ) | |
| | ) | |
| Intervenor Defendant. | ) | |
| | ) | |

---

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

CLAUDIA BURKE
Assistant Director

OF COUNSEL:

BRENDAN SASLOW
Senior Attorney
Office of the Chief Counsel
for Trade Enforcement and
Compliance
U.S. Department of Commerce
Washington, D.C.

MEEN GEU OH
Senior Trial Counsel
U.S. Dept. of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-0184
Fax: (202) 307-0972
E-mail: Meen-Geu.Oh@usdoj.gov

October 18, 2022

Attorneys for Defendant

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

    I.     The Administrative Determination Under Review ................................. 2

    II.    Issue Presented For Review ................................................................ 2

STATEMENT OF FACTS ...................................................................................... 2

SUMMARY OF THE ARGUMENT ........................................................................ 6

ARGUMENT ....................................................................................................... 7

    I.     Standard Of Review ............................................................................. 7

    II.    Commerce's Facts Available Decisions Are Supported By Substantial Evidence And In Accordance With The Law .......................... 9

        A.  Substantial Evidence Supports Commerce's Decision To Use Facts Available To Determine The Quantity of Euro SME's Home Market and U.S. Sales Transactions ................................................... 10

        B.  Substantial Evidence Supports Commerce's Reliance On Facts Available To Determine Inland Freight Expenses For Certain Home Market Transactions... 17

    III.   Commerce's Reliance On Adverse Facts Available To Determine Domestic Inland Freight Expenses For Euro SME's U.S. Sales Transactions Was Supported By Substantial Evidence And In Accordance With Law Because None Of Euro SME's Relevant Expenses Were Verifiable And Euro SME Did Not Act To The Best of Its Ability ................................................. 20

    IV.   Euro SME Did Not Timely Challenge Commerce's Determination To Continue To Rely On Its Preliminary Method For Capping Freight Revenue And Its Challenge Is Thus Time-Barred .............................. 26

CONCLUSION ................................................................................................... 29

## **TABLE OF AUTHORITIES**

**Cases**                                                                       **Page(s)**

*Am. Alloys, Inc. v. United States*,
    30 F.3d 1469 (Fed. Cir. 1994) ................................................................................. 13

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) .................................................................................. 8

*Cemex, S.A. v. United States*,
    19 C.I.T. 587 (1995), *aff'd on other grounds* 133 F.3d 897 (Fed. Cir. 1998) .......................... 26

*Ceramica Regiomontana, S.A. v. United States*,
    810 F.2d 1137 (Fed. Cir. 1987) .................................................................................. 9

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ................................................................................................. 8

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ................................................................................................. 8

*Dorbest Ltd. v. United States*,
    604 F.3d 1363 (Fed. Cir. 2010) ........................................................................... 26, 27

*Fujitsu Gen. Ltd. v. United States*,
    88 F.3d 1034 (Fed. Cir. 1996) .................................................................................. 8

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) .............................................................. 8

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992) ................................................................................................. 8

*Micron Tech., Inc. v. United States*,
    117 F.3d 1386 (Fed. Cir. 1997) ................................................................................. 13

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) ........................................................................... 9, 20

*NTN Bearing Corp. v. United States*,
    74 F.3d 1204 (Fed. Cir. 1995) .................................................................................. 26

*Nucor Corp. v. United States*,
    612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) .............................................................. 8

*PAM, S.p.A v. United States*,
　　582 F.3d 1336 (Fed. Cir. 2009) ............................................................. 20

*Peer Bearing Co. v. United States*,
　　57 F. Supp. 2d 1200 ............................................................................... 26

*QVD Food Co. v. United States*,
　　658 F.3d 1318 (Fed. Cir. 2011) ............................................................. 26

*SGL Carbon LLC v. United States*,
　　819 F. Supp. 2d 1352 (Ct Int'l Trade 2012) .......................................... 26

*Shandong Huarong Gen. Corp. v. United States*,
　　159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) .............................................. 8

*Stanley Works (Langfang) Fastening Systems Co., Ltd. v. United States*,
　　964 F. Supp. 2d 1311 (CIT 2013) .......................................................... 27

*Torrington Co. v. United States*,
　　68 F.3d 1347 (Fed. Cir. 1995) ............................................................... 13

*Wheatland Tube Co. v. United States*,
　　161 F.3d 1365 (Fed. Cir. 1998) ............................................................... 9

**Statutes**

19 U.S.C. § 1516a(b) ....................................................................................... 8

19 U.S.C. § 1675(h) ....................................................................................... 26

19 U.S.C. § 1677e ......................................................................................... 19

19 U.S.C. § 1677e(a) .................................................................................. 9, 14

19 U.S.C. § 1677e(b) ..................................................................................... 20

**Federal Register**

*Retail Carrier Bags from Malaysia*, 69 Fed. Reg. 48,203 (Dep't of Commerce Nov. 9, 2004)
　　(Order) .................................................................................................... 2

*Retail Carrier Bags from Malaysia*, 86 Fed. Reg. 49,309 (Dep't of Commerce Sept. 2, 2021)
　　(Preliminary Results) .............................................................................. 3

*Retail Carrier Bags from Malaysia*¸ 87 Fed. Reg. 12,933 (Dep't of Commerce Mar. 8, 2022) (Final Results) .......................................................................................................... 1

*Retail Carrier Bags from Malaysia: Preliminary Results 2019-2020*, 86 Fed. Reg. 49309 (Sep. 2, 2021)............................................................................................................................ 11

**Rules**

U.S. Ct. Int'l Trade R. 56.2 ................................................................................................ 1

**Regulations**

19 C.F.R. § 351.308 ........................................................................................................... 9

19 C.F.R. § 351.309(c)................................................................................................. 27, 28

19 C.F.R. § 351.309(d) ..................................................................................................... 27

19 C.F.R. § 351.224(c)................................................................................................. 27, 28

19 C.F.R. § 351.224(f) ..................................................................................................... 26

19 C.F.R. § 354.414 ......................................................................................................... 10

19 C.F.R. § 354.414(c)..................................................................................................... 4, 6

19 C.F.R. § 354.414(d) ..................................................................................................... 4

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |  |
|---|---|---|
| EURO SME SDN BHD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 22-00108 |
| | ) | PUBLIC VERSION |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| POLYETHYLENE RETAIL CARRIER | ) | |
| BAG COMMITTEE, HILEY POLY CO., | ) | |
| LLC, and SUPERBAG CORPORATION, | ) | |
| | ) | |
| | ) | |
| Intervenor Defendant. | ) | |
| | ) | |

DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade,

defendant, the United States, respectfully submits this response to the motion for judgment on

the agency record filed by plaintiff, Euro SME Sdn Bhd (Euro SME), ECF No. 23, 24 (Euro

SME Br.).  Euro SME challenges aspects of the Department of Commerce's final results of the

2019-2020 administrative review of the antidumping duty order on polyethylene retail carrier

bags (retail carrier bags) from Malaysia.  As we explain below, Commerce's determination is

supported by substantial evidence and it is not contrary to law.  We respectfully request that the

Court deny Euro SME's motion and sustain Commerce's final determination.

<u>STATEMENT PURSUANT TO RULE 56.2</u>

I.      <u>The Administrative Determination Under Review</u>

Euro SME challenges the final results of the 2019-2020 antidumping duty administrative review of the order on retail carrier bags from Malaysia, published as *Retail Carrier Bags from Malaysia¸* 87 Fed. Reg. 12,933 (Dep't of Commerce Mar. 8, 2022) (Final Results), Appx2173-2175, and accompanying issues and decision memorandum (Dep't of Commerce Mar. 1, 2022) (IDM), Appx2158-2172.  The administrative review covers the period August 1, 2019, through July 31, 2020.

II.     <u>Issues Presented For Review</u>

1.      Whether substantial evidence supports Commerce's determinations to rely on facts available to adjust (1) actual weight variables reported in Euro SME's sales transactions and (2) some of Euro SME's reported home market inland freight expenses.

2.      Whether substantial evidence supports Commerce's determination to apply an adverse inference in selecting from among the facts available to determine certain domestic inland freight expenses reported by Euro SME because (1) Euro SME's relevant data could not be verified and (2) Euro SME repeatedly failed to act to the best of its ability and seemingly tried to mask material discrepancies between the figures it reported and its own back-up documents.

3.      Whether Euro SME's ministerial error allegation as to Commerce's determination to cap freight revenue was untimely and thus improper.

<u>STATEMENT OF FACTS</u>

In August 2004, Commerce published an antidumping duty order covering retail carrier bags from Malaysia.  *Retail Carrier Bags from Malaysia*, 69 Fed. Reg. 48,203 (Dep't of Commerce Nov. 9, 2004) (Order).  The antidumping duty order covers items such as "t-shirt

sacks, merchandise bags, grocery bags, or checkout bags." IDM, Appx2159. This case concerns a recent administrative review of that order.

The plaintiff is Euro SME, which is a Malaysian-based packaging products manufacturer. The relevant facts commence in August 2020, when Commerce published a notice of opportunity for interested parties to request an administrative review of the aforementioned antidumping duty order. Appx1003. Shortly after publication of that notice, the Polyethylene Retail Carrier Bag Committee and its individual members, Hilex Poly Co., LLC and Superbag Corp. (petitioners below and now defendant-intervenors) requested that Commerce review Euro SME. Appx1000. No party requested a review of any other entity. On October 1, 2021, Commerce initiated its administrative review, Appx1025-1038, and shortly thereafter, issued an initial questionnaire to Euro SME as the only respondent under review, Appx1050.

About a year later, on September 2, 2021, Commerce published its preliminary results. *Retail Carrier Bags from Malaysia*, 86 Fed. Reg. 49,309 (Dep't of Commerce Sept. 2, 2021) (Preliminary Results), Appx1870-1871, and accompanying Preliminary Decision Memorandum (PDM) (Dep't of Commerce Aug. 27, 2021), Appx1843-1853. As part of that assessment, Commerce preliminarily calculated an estimated weighted-average dumping margin of 0.00 percent for Euro SME. Appx1837. Over the next several months, between December 2021 through January 2022, interested parties submitted case and rebuttal briefs for Commerce's consideration. Petitioners contended in their submissions that there were "material differences" between Euro SME's verification documents and its prior reported numbers, and that certain adjustments to the calculation were thus necessary. *See* Appx2161, Appx2165.

On March 8, 2022, Commerce published its Final Results. Final Results, Appx2173-2175; IDM, Appx2158-2172. In that decision, Commerce explained that it vetted Euro SME's

relevant sales transactions and concluded that Euro SME "made sales of subject merchandise at less than normal value."  IDM, Appx2158.  Based upon relevant calculations, Commerce determined a final weighted-average dumping margin of 6.47 percent for Euro SME.  Appx2176.

This case involves three findings that affected that weighted average calculation.

First, Commerce relied on facts available to adjust the actual weight of merchandise that Euro SME reported in its sales transactions.  As background, Commerce typically evaluates an examined entity's sales data both at home and abroad to, in part, vet whether that entity is pricing merchandise consistent with its normal value.  *See* 19 C.F.R. § 351.414(c), (d).  Here, Euro SME provided relevant sales data, which then prompted Commerce to verify whether Euro SME was accurately reporting the actual weight of merchandise associated with those examined sales.  IDM, Appx2163.  In attempting to verify the information Euro SME had supplied, however, Commerce determined that the actual weight data reported in Euro SME's back-up documents did not in large part reconcile with the information Euro SME had reported.  IDM, Appx2163-2164.  Accordingly, rather than trusting Euro SME's bare insistence that Commerce should trust its prior reported figures rather than what its back-up documents showed, Commerce relied on facts available—in the form of a weight adjustment—to determine the actual weight of retail carrier bags for each transaction in Euro SME's home market and U.S. sales databases.  IDM, Appx2165.  In basic terms, Commerce adjusted Euro SME's reported actual weights to better align with what its own back-up documents revealed.  *See id*.

Second, related to the above-stated analysis, Commerce also observed inconsistencies with respect to expenses that Euro SME reported for inland freight from its plant or warehouse to customers in its home market (INLFTCH) and inland freight from its plant or warehouse to the port of exit in route to U.S. customers (DINLFTPU).  IDM, Appx2166-2171.  Accordingly, it

adjusted these variables as well.  Regarding the first category of inland freight expenses, Commerce spot-checked the data by scrutinizing five specific home market transactions that it had identified for verification.  IDM, Appx2166-2168.  In doing so, it determined that there were discrepancies associated with four of these transactions, but they were relatively small and could plausibly be explained by rounding decisions in Euro SME's calculations.  IDM, Appx2167-2168.  Commerce thus determined that it was not necessary to rely on facts available for any of these transactions or the remaining transactions in the home market database.  IDM, Appx2168. But with regard to the fifth transaction, Commerce found that the inconsistency in that transaction was too large to be explained by a rounding decision.  *Id*.  As a result, Commerce relied on facts available for the data covered by the document and adjusted only the affected reported numbers to better align with the expenses Euro SME supported through verification.  *Id*.

Third, Commerce adjusted costs related to Euro SME's second category of inland freight expenses (*i.e.*, DINLFTPU, or home inland freight expenses for shipments destined for U.S. markets).  Appx2168-2171.  Commerce again observed discrepancies between these inland freight expenses that Euro SME reported for certain transactions in its U.S. sales database and the supporting invoices Euro SME provided during the verification process.  IDM, 2169-2170. Commerce explained that these variances were "not immaterial" and that the variances persisted even though Commerce had notified Euro SME of the discrepancies in an intervening supplemental questionnaire.  IDM, Appx2170.  Commerce thus determined that the results of verification did not provide a basis for determining that Euro SME's reported per-unit domestic inland freight expenses were reliable.  *Id*.  And based on other surrounding facts, Commerce stated that Euro SME seemed to be attempting to "mask" clear variances in the numbers it had previously reported and what its back-up documentation showed by utilizing vague and results-

oriented math to support its prior reported numbers.  IDM, Appx2171.  Commerce thus

determined that Euro SME failed to cooperate by not acting to the best of its ability in

responding to Commerce's request for information and applied an adverse inference when

selecting from among the facts available in determining Euro SME's domestic inland freight

expenses.  *Id*.  To implement those findings, Commerce applied an adjustment to all of Euro

SME's domestic inland freight expenses, DINLFTPU, based on the highest exhibit-wide

variance, as a percent, among the U.S. sales it had traced during verification.  *Id*.

Following the publication of Commerce's Final Results, Euro SME filed a ministerial

error allegation on Commerce's record.  Appx2210-2215, Appx82766-82771.  In its allegation,

Euro SME alleged that Commerce erred by underestimating a cap for freight revenue expenses

and inappropriately omitting certain movement expenses.  *Id.*  Commerce determined, however,

that the ministerial error allegation was untimely because Commerce relied on the same method

for capping freight revenue expenses in the Preliminary Results and the Final Results, and Euro

SME failed to raise its arguments in its administrative case brief.  Appx2226.  Under 19 C.F.R. §

351.224(c)(1), a party must raise any comments concerning ministerial errors in preliminary

results in its administrative case brief.  The perceived error could have been identified earlier in

the administrative review and Euro SME did not do so.  Appx2226.  Commerce thus determined

that Euro SME's ministerial error allegation was untimely and declined to make any changes to

its final determination.  Appx2227.

<u>SUMMARY OF THE ARGUMENT</u>

In the course of deriving a weighted average dumping margin for Euro SME, Commerce

relied on "facts otherwise available" to adjust certain information Euro SME had reported in its

sales and cost data.  It did so because the information Euro SME had provided during the

verification process could not be reconciled with data that Euro SME had previously reported. Euro SME contests the application of facts available these instances, but it does so based on a clear misunderstanding of what Commerce actually did and based upon arguments that do not accord with record evidence. All Commerce did was adjust Euro SME's data to better align with Euro SME's own back-up documents. Euro SME has no basis to argue otherwise, and it thus has no basis to challenge Commerce's determinations.

With respect to one data variable—Euro SME's reported domestic inland freight data for U.S. sales—Commerce applied an adverse inference against Euro SME in choosing among the facts otherwise available. It did so because Euro SME's domestic inland freight data for U.S. sales could not be verified, and because Euro SME had repeatedly failed to act to the best of its ability and seemingly tried to mask material discrepancies between the figures it reported and its own back-up documents. The record validates this finding. Euro SME contests the issue, but other than offering broad, unsupported statements, it presents no meaningful explanation as to why it believes Commerce erred.

Euro SME lastly brings a ministerial error challenge to Commerce's weighted average calculation. It insists that Commerce's method of calculation is mistaken. But as Commerce correctly explained, Euro SME's specific challenge is untimely and thus improper. Euro SME knew of Commerce's method long before Commerce's final results and raised no objection. The law is decisive on the question, and Euro SME's argument is thus time-barred.

ARGUMENT

I.    Standard Of Review

"{T}he Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034,

7

1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  Substantial evidence is "more

than a mere scintilla" of relevant evidence.  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229

(1938).  But it is only "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion, taking into account the entire record, including whatever fairly detracts

from the substantiality of the evidence."  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562

(Fed. Cir. 1984) (internal quotations and citations omitted).  "{T}his is something less than the

weight of the evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations

omitted).  "{T}he possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by substantial evidence."  *Id.*

Rather, when Congress has entrusted an agency to administer a statute that demands inherently

fact intensive inquiries—as in this administrative review—Commerce's conclusions may be set

aside only if the record contains evidence "so compelling that no reasonable factfinder" could

reach the same conclusion.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord*

*Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

Thus, "the Court will not disturb an agency determination if its factual findings are

reasonable and supported by the record as a whole, even if there is some evidence that detracts

from the agency's conclusion."  *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d

714, 718 (Ct. Int'l Trade 2001); *see also Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d

1323, 1326 (Ct. Int'l Trade 2006) ("{T}he Court may not substitute its judgment for that of the

{agency} when the choice is between two fairly conflicting views, even though the court would

justifiably have made a different choice had the matter been before it *de novo*." (internal

quotations and citations omitted)).  Lastly, it is not necessary for Commerce to provide "{a}n

explicit explanation . . . where {its} decisional path is reasonably discernible."  *Wheatland Tube*

*Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) (citing *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may uphold {an agency's} decision of less than ideal clarity if the agency's path may be reasonably discerned." (internal quotation and citation omitted))).

II.     Commerce's Facts Available Decisions Are Supported By Substantial Evidence And In Accordance With The Law

A large part of this case concerns Commerce's use of a legal mechanism called "facts otherwise available" or "facts available."  Under 19 U.S.C. § 1677e(a), Commerce is permitted to use "facts otherwise available" in reaching its determinations if it determines that (1) "necessary information is not available on the record," (2) "an interested party or any other person . . . fails to provide such information by the deadlines . . . or in the form and manner requested," or (3) the interested party "provides such information but the information cannot be verified."  19 U.S.C. § 1677e(a); *see also* 19 C.F.R. § 351.308 (providing for "{d}eterminations on the basis of the facts available").  The purpose of "facts otherwise available" is to "fill in . . . gaps" in the administrative record.  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).

Here, Commerce used "facts otherwise available" to reach two specific determinations.  First, it used "facts otherwise available" to determine the quantity of merchandise associated with Euro SME's domestic market and U.S. sales transactions.  Second, it used facts available to determine inland freight expenses for certain of Euro SME's home market transactions.  For both determinations, Commerce turned to the "facts otherwise available" statute—rather than trusting Euro SME's prior reported numbers—because the back-up information Euro SME had supplied during verification to support its numbers did not in large part align with what Euro SME previously reported.  As we explain below, both decisions should be sustained because they are

supported by substantial evidence and accord with the law.

> A.   Substantial Evidence Supports Commerce's Decision To Use Facts Available To Determine The Quantity of Euro SME's Home Market and U.S. Sales Transactions

By way of background, when assessing whether an entity is selling merchandise for less than normal value in American markets, Commerce scrutinizes (and compares) that entity's reported sales transactions at home (or in third countries) and in the United States. *See* 19 C.F.R. 354.414.  Here, as part of the questionnaire process in this case, Commerce asked Euro SME to report information pertaining to sales in its home (or third country) market, as well as information pertaining to sales in the United States, *i.e.*, QTYH, home market quantity, and QTYU, U.S. sales quantity.  Appx1097-1098, Appx1127-1128.  In response to Commerce's request, Euro SME responded by providing sales databases for its home market and U.S. sales of subject merchandise.  IDM, Appx2163; Home Market and U.S. Sales Databases, C.R. 26-27.[1]

Within these databases, Euro SME reported four variables indicating a quantity of merchandise associated with each of its transactions.  Specifically, the databases listed the quantity of merchandise based on the number of cartons in the transaction (QTYH/U), the quantity of merchandise on a 1000 bag basis for each transaction (QTYBAGH/U), and two variables for weight per kilogram tied to each transaction.  IDM, Appx2163.  These last two variables, for weight per kilogram, were standard weight (QTYKG1H/U) and actual weight (QTYKG2H/U).  *Id*.; Appx81019; Appx81040.

---

[1] Euro SME remitted these databases to Commerce in Statistical Analysis System (or SAS) format, which requires SAS software to access it.  We are unable to convert plaintiff's data to a different version to include within a paper Appendix.  If the Court wishes to examine the data files, which are nonetheless distilled in detail throughout the record, we are willing to confer with the Plaintiffs to determine a way to remit SAS data to the Court physically, perhaps in the form of a CD filing.

Commerce then attempted to vet those reported numbers.  Commerce asked Euro SME to verify its sales transactions through a Verification Questionnaire.  Appx1991-1997, Appx81836-81842.[2]  In doing so, it requested something called "sales-trace" packages.  Appx1993-1995, Appx81838-81840.  That request asked Euro SME to provide documentation supporting the information that it reported in its questionnaire responses including various enumerated documents, such as invoices and freight bills, as well as "a narrative of the sales process for each of the transactions identified."  *Id*.; IDM, Appx2163.  Importantly, because Commerce cannot reasonably scrutinize every one of Euro SME's reported sales, it instead specified six transactions—three transactions to the United States and three transactions in the home market— through which it planned to verify Euro SME's reported data.  Appx1993-1995, Appx81838-81840.;[3] *see also* IDM, Appx2170 (explaining that verification "involves spot checking reported information to determine its accuracy and reliability").

Problems arose when Euro SME provided its verification responses.  The actual weight Euro SME had reported as being associated with the specified transactions in its sales databases did not, for the most part, reconcile with the actual weights reported in Euro SME's sales trace packages.  IDM, Appx2163.  To explain, Euro SME provided something called "loading advice" documents to support its reporting of the quantity/weight variables in the home market

---

[2] Commerce did not conduct an onsite verification because it was unable to do so during this time period.  *See* Appx1990 (citing *Retail Carrier Bags from Malaysia: Preliminary Results 2019-2020*, 86 Fed. Reg. 49309 (Sep. 2, 2021)).  Euro SME does not challenge Commerce's method of verification.  *See* Euro SME Br.

[3] To make clear what information it was requesting, Commerce identified these transactions by number—SEQU ████████████ and SEQH █████████████████—and specified six corresponding invoice numbers INVOICE1U ████████████ and INVOICEH █████████████████, thus pinpoint the entries in Euro SME's databases for which it sought documentation.  Appx1993-1995, Appx81838-81840; IDM, Appx2163.

(QTYKG2H) and U.S. sales databases (QTYKG2U). *Id.* These loading advice documents were specifically provided to support the quantity in kilograms of actual weight associated with its transactions in its sales databases. *Id.* and n.23; Appx2006-2007, Appx81851-81852. Because "actual weight is not normally recorded in Euro SME's systems," it was clear to Commerce that "Euro SME relied on the{se} 'loading advice' documents to report {the} actual weight" data that Euro SME had provided to Commerce within its sales databases. IDM, Appx2163. As it turns out, however, these "loading advice" documents were, in large part, irreconcilable with the data Euro SME had reported in its sales data. *Id.*; Appx1998-2093, Appx81843-82224.

The problems did not end there, however. Euro SME had included hand-written notes that indicated an allocated portion of the total actual weight on each "loading advice" document to the amount that Euro SME reported in its home market sales database for the transactions Commerce specified. IDM, Appx2163. Knowing that the numbers would not align, these handwritten notes were provided for the purpose of reconciling the clear and apparent discrepancy between the number Euro SME had previously reported and the actual weight data its back-up documents revealed at verification. IDM, Appx2163-2164. But Commerce found that the total actual weight for the specified transactions did not resolve the issue. *Id.*; Appx2185, Appx2197-2199, Appx82280, Appx82750-82751. Upon examination, Commerce determined that these handwritten allocations did nothing more than ascribe a purported actual weight to the transactions Commerce sought to verify—to match whatever actual weight Euro SME had previously reported for those transactions—and then assign any leftover weight to sales transactions, on each "loading advice" document, that Commerce was not verifying. IDM, Appx2164. In other words, the allocations were results oriented, and thus useless for verification purposes. Euro SME, for its part, provided no explanation in its Verification Questionnaire

response as to how or why it allocated weight in its handwritten notes, much less disclose the existence of any discrepancy to Commerce. *Id*. And Commerce only discovered the discrepancy when it analyzed these purported allocations on a broader scale and found that accepting them would result in inconsistent and unexplained actual weights for remaining transactions within Euro SME's data. *Id*.; Appx2197-2199, Appx82750-82751.

These are the facts that support Commerce's "facts available" decision, and they show that Euro SME has no basis to argue that Commerce acted irrationally in making necessary adjustments to resolve a clear gap in the record. According to Euro SME, however, Commerce did not have to resort to "facts available" to conduct its assessments as to the quantity of products associated with Euro SME's reports sales transactions. First, it argues that Commerce acted unreasonably in adjusting the actual weight for all of Euro SME's home market and U.S. sales transactions because it does not rely on actual weight in the normal course of business. Euro SME Brief at 7. It claims that Commerce should have instead relied on reported quantities or standard weight variables—as opposed to actual weight—while evaluating Euro SME's sales transactions. *Id*. Second, Euro SME asserts that the differences between actual weight and standard weight were relatively minor and that it was thus unnecessary to revise the actual weight for its transactions. *Id.*

Neither argument is persuasive. All these arguments do is second-guess the appropriateness of Commerce's verification process, which does not make a compelling case. As courts have recognized, to make the verification process effective, Commerce has broad discretion and latitude in how it chooses to conduct its verification procedures. *See, e.g., Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1394-95 (Fed. Cir. 1997); *Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995); *Am. Alloys, Inc. v. United States*, 30 F.3d 1469,

1475 (Fed. Cir. 1994).  Here, Commerce specifically asked Euro SME to provide relevant

evidence of its sales transactions.  IDM, Appx2163.  It then asked Euro SME to verify its sales

transactions through a Verification Questionnaire, and specifically instructed Euro SME to verify

the actual weight data that it had reported within its prior responses.  Appx1991-1997,

Appx81836-81842; *see also* Appx1990 (communication with Euro SME counsel regarding

verification).  Euro SME, in turn, provided "loading advice" documents to support its actual

weight numbers.  IDM, Appx2163.  Not only did that actual weight data fail to align with the

data Euro SME had put on the record, Euro SME inexplicably tried to gloss over these

discrepancies by endorsing allocations that the numbers themselves could never reconcile.

Appx1998-2093, Appx81843-82224.  At bottom, Euro SME's *own* reported data could not be

reconciled with its *own* verification documents, *see* IDM, Appx2164, and that justifies

Commerce's use of "facts available."  19 U.S.C. § 1677e(a) (explaining that Commerce may use

facts available when information provided by an entity cannot be verified).

Euro SME, for its part, does not contest any of these underlying record facts.  Instead, it

insists that, if Commerce could not verify actual weight data, it should have instead used another

alternative method for deriving quantity, such as standard weight or the actual number of bags,

both of which Euro SME reported.  Euro SME's Brief at 12-15.  But Commerce explained

precisely why that was not possible.  At that stage in the review, *i.e.*, post-Preliminary Results,

making a determination on these alternative grounds would have required a ratio to convert the

gross unit price and sales expense variables, which Euro SME reported on an actual weight basis,

to either standard weight or an actual number of bags.  IDM, Appx2165.  Yet there was no

conversion ratio available on the record.  *Id*.  And even if that were not the case, Commerce

would still have had to rely on the actual weight variable that Euro SME reported for purposes of

that conversion.  *Id*.  Here, there is no meaningful dispute that Euro SME's reported actual

weights are not verifiable.  *Id*.

Euro SME's broader thematic point is that it does not normally record "actual weight"

data in the normal course of its business, Euro SME Br. at 10, and it was thus improper for

Commerce to conduct an assessment based upon that variable.  But Euro SME has no basis for

that argument.  Euro SME is deeply familiar with reviews under this order, and it has known that

Commerce has used actual weight for its assessments under the order since at least 2009.

*Polyethylene Retail Carrier Bags from Malaysia*, 74 Fed. Reg. 58,947 (Dep't of Comm. Nov. 16,

2009), and accompanying IDM at Cmt. 7, accessible at 74 ITADOC 32880 (informing Euro

Plastics—a Euro SME entity—that "actual weights" are "more accurate than standard weights"

and Commerce will "continue{} to use the actual weights in calculating the per-unit sales prices

and costs").  That is why Euro SME (at the outset) provided "actual weight" data without any

specific prompting by Commerce.  *Compare* Appx1097-1098 (Commerce requesting quantity

data) *with* Appx1352 (voluntarily providing "actual weight" data without prompting).  Then

Commerce, as it has historically done, made clear that it was relying upon actual weight for

determining the margin in its Preliminary Results analysis.  Appx1856.  After that, Commerce

(after releasing its preliminary results) asked Euro SME to verify its own reported actual weight

numbers through a Verification Questionnaire.  Appx1991-1997, Appx81836-81842; Appx1990.

In fact, the only place on the record where Euro SME voiced any concern about

Commerce's use of actual weight data was in it rebuttal case brief, after Commerce had already

collected all of Euro SME's information to determine a margin, on the basis of actual weight,

approximately two months before Commerce's statutory deadline to issue final results, *see* 19

U.S.C. § 1675(a)(3)(A) (indicating that Commerce has 365 days to complete antidumping

reviews), which is well-beyond Commerce's regulatory deadline for submitting new factual information, *see* 19 C.F.R. § 351.301(c)(5) (indicating that, unless new deadlines for factual information are established, the latest parties may issue factual information is 30 days before the scheduled date of Commerce's preliminary results, in administrative reviews).  Euro SME cannot claim to have been surprised that such information was important to Commerce's assessment when all involved knew that the information was material to the analysis.

There is an added problem with Euro SME's argument, however.  Euro SME seems to blame Commerce for choosing to derive averages or estimations when ascribing actual weight values to specific transactions, Euro SME Br. at 10, rather than referring to actual documents in its possession to vet the accuracy of the numbers it was reporting.  Commerce asked for quantity data, Appx1097-1098, not "samplings" or estimations of that data.  Commerce *never* asked Euro SME to derive incorrect numbers and then to make it appear as if they corresponded to actual transactions on its sales databases.  Euro SME unilaterally chose to provide its "actual weight" data in a misleading way and only raised the problems relating to the data that it provided, such as that its actual weight data was "based on a random sampling of a few cartons in each shipment," late in the review, when it would have been difficult for Commerce to collect an entirely new set of information and reconfigure its calculations.  Appx2137-2138, Appx82259-82260.  That Euro SME could not then validate those numbers—because they were inaccurate—is a problem of Euro SME's own making.  Importantly, Euro SME does not explain why, upon being asked to verify those numbers, it sought to include handwritten (and results oriented) "actual weight" allocations to justify prior numbers that it knew it could never validate.  IDM, Appx2163-2164; *see* Appx2185, Appx2197-2199, Appx82280, Appx82750-82751.  Euro SME portrays itself as aggrieved, but its explanation does not add up.

In short, Euro SME has no meaningful basis to insist that Commerce erred.  As Commerce found, the total actual weight indicated on most (*i.e.*, five out of the six) "loading advice" documents included within Euro SME's sales-trace packages did not reconcile with the total actual weight for the same transactions reported in Euro SME's sales databases.  IDM, Appx2164.  There is no dispute that those numbers could not be verified.  And because Commerce could not verify the relevant transactions (nor did Euro SME explain "the variances between the reported actual weights and the supporting documentation"), Commerce appropriately relied on facts available to adjust the reported actual weights to conform with the actual weights indicated on Euro SME's back-up documentation, *i.e.*, the "loading advice" documents.[4]  IDM, Appx2165.  Each of these findings is explained and supported by the record evidence.  Those findings should be sustained.

B.     Substantial Evidence Supports Commerce's Reliance On Facts Available To Determine Inland Freight Expenses For Certain Home Market Transactions

Commerce also relied on facts available to determine the inland freight expenses for certain of Euro SME's reported home market transactions.  The facts giving rise to that decision largely track the factual developments described above and thus stem from the inconsistencies between Euro SME's initially reported numbers, and the numbers it later provided during

---

[4] To do so, Commerce used facts available to adjust characteristics of the transactions that Euro SME reported to account for the discrepancy between the "loading advice" documents and the actual weights reported in Euro SME's sales databases.  IDM, Appx2165.  As Commerce explained, it "relied on the exhibit-specific variance, between the weight listed on the 'loading advice' documents and the cumulative actual weight of the associated transactions as reported in the {relevant} database, to adjust the associated gross unit price (GRSUPR2H/U) and the expenses reported on an actual weight basis."  *Id.*; Appx2197-2199, Appx82750-82751.  Commerce then repeated this same adjustment process for each transaction covered by the relevant "loading advice" document with the information specific to those transactions and the relevant loading advice document.  IDM, Appx2165; Appx2181-2188, Appx2197-2199, Appx82276-82283, Appx82750-82751.

verification.  *Compare* Euro SME Initial Questionnaire Response, Appx 1354, Appx80328 *with* Verification Questionnaire, Appx1994-95, Appx818389-90 (asking for supporting documents including "shipping documents such as freight bills" including some "screenshot(s) of {its} accounting system that demonstrate how {it} recorded inland freight expenses" for certain transactions) *and* Euro SME's Verification Questionnaire Response, Appx1998-2093, Appx, 81843-82224 (providing responses).[5]

Before expounding on Commerce's rationale, an important point bears mentioning.  As part of the verification process, Euro SME was required to provide detailed explanation surrounding its reported inland freight expenses.  *See* IDM, Appx2167; Appx82000, Appx82020, Appx82024, Appx82041, Appx82045, Appx82066.  Euro SME's responses were "limited," and thereby unhelpful.  *See* IDM, Appx2167.  That lack of meaningful response takes on added significance here because there were variances between what Euro SME had previously reported for its inland freight expenses and what its back-up documents revealed.  *See id*.  Nevertheless, as it relates to this particular issue, Commerce chose to resolve the inconsistency on its own, finding that *most* of the variances were sufficiently minor such that they could plausibly be ascribed to "rounding" decisions.  *Id*.  Thus, despite the lack of explanation, Commerce did what it could to resolve the matter and chose not to adjust Euro SME's data as it related to these smaller variances.  *Id*.

For one inland freight transaction, however, the discrepancy could not plausibly be ascribed to a rounding decision.  IDM, Appx2168.  Nor was the variance minor.  *Id*.  When confronted by that clear discrepancy, Euro SME tried to explain away this large variance by

---

[5] Commerce also asked Euro SME to include "additional supporting documentation that corroborates the reported expense and a narrative response that explains how the documentation provide support for the freight expense."  Appx1995, Appx81840.

contending that the numbers did not align because the products at issue were shipped to two different destinations.  Appx2011-2012, Appx81856-81857.  But Euro SME provided no back-up for that explanation.  *See id.*  In fact, the relevant invoice that Euro SME had provided to support the transaction itself indicated that there was only one destination for the merchandise, IDM, Appx2168; Appx82102; Appx82752-82754, thus contradicting Euro SME's purported explanation for why the data did not align.  Lacking any other explanation or evidence, Commerce relied on facts available to determine inland freight expenses for the transactions covered by that specified invoice on the ground that Euro SME's reported figures were not verifiable.  IDM, Appx2168.  Commerce thus adjusted those reported amounts to better match the per unit amount corresponding to the total inland freight cost verified based upon Euro SME's own supporting invoice.  *Id.*[6]

In challenging Commerce's assessments on this issue, Euro SME contends that Commerce applied an adverse inference "with respect to certain Malaysian inland freight data it reported in the home market and U.S. sales databases (as INLFTCH and DINFLTPU, respectively)."  Euro SME Brief at 2.  That is not an accurate statement, nor does any plausible reading of Commerce's decision support that claim.  Commerce never made a finding that Euro

---

[6] To do the calculation, Commerce first calculated an exhibit-wide variance.  IDM, Appx2168.  Commerce determined the total inland freight expense, by relying on actual weight as a quantity, QTYG2H, and multiplying the quantity for each transaction covered by the invoice Euro SME provided for purposes of verification, SEQHs ███████████████████, by the reported unit cost, in Malaysian currency (MYR), of inland freight, INLFTCH.  Appx82752-82754; Appx82102.  This resulted in the total reported freight value for the relevant transactions, ██████ MYR.  Appx82752-82754.  Next, Commerce subtracted the product of its previous calculation from the freight value expense indicated on the relevant verification invoice.  *Id.*  This resulted in the amount of discrepancy between the reported freight expense and the freight expense on the verification invoice, ██████ MYR.  *Id.*  Finally, to determine the percentage variance, Commerce divided the difference by the total amount reported for all transactions in the invoice, resulting in a variance of █████ percent.  *Id.*  Commerce then applied the percentage variance as an adjustment to INLFTCH for the relevant transactions.  Appx82278-82279.

SME failed to cooperate to the best of its ability as to inland freight expenses for home market

transactions (INLFTCH).  *See* IDM, Appx2168.  Commerce made clear that it used facts

otherwise available on the record, without applying an adverse inference, to resolve the issue.

*Id*. (explaining the application of facts available without any discussion of an adverse inference).

As Commerce's decision indicates, it did nothing more than adjust some of Euro SME's

previously reported inland freight data amounts to match the per unit amount corresponding to

the total inland freight cost verified based upon the directly supporting invoice.  *See id*.  And it

did so with respect to *just one invoice*, meaning Commerce's adjustment was narrowly tailored

and applied only to the relevant subset of Euro SME's reported data.  *See id*.  The foundational

basis for Euro SME's argument is thus incorrect, meaning its challenge to Commerce's limited

adjustment to its inland freight expenses is thus improper and should be denied.

III.   Commerce's Reliance On Adverse Facts Available To Determine Domestic Inland
       Freight Expenses For Euro SME's U.S. Sales Transactions Was Supported By
       Substantial Evidence And In Accordance With Law Because None Of Euro SME's
       Relevant Expenses Were Verifiable And Euro SME Did Not Act To The Best of Its
       Ability

       As we explained above, 19 U.S.C. § 1677e is the "facts available" statute and allows

Commerce to fill gaps in the record when that information is not otherwise available.  That

statute has an important added feature.  In some instances, it authorizes Commerce to use an

inference that is *adverse* to the interests of a party in selecting from among the facts otherwise

available to fill gaps in the record.  19 U.S.C. § 1677e(b)(1)(A).  This is known as adverse facts

available or AFA.  The AFA inference can be applied when the interested party has failed to

cooperate "by not acting to the best of its ability to comply with a request for information."  *Id*.

And when that inference is applied, Commerce "is not required to determine, or make any

adjustments to, a . . . dumping margin based on any assumptions about information the interested

party would have provided if {it} had complied with the request for information."  19 U.S.C. § 1677e(b)(1)(B).

The AFA statute thus imposes clear requirements on a responding party.  It requires a respondent to act to "the best of its ability"—that is, to put forth "maximum" effort to comply with Commerce's request.  *Nippon Steel*, 337 F.3d at 1382 ("Compliance with the 'best of its ability' standard is determined by assessing whether the respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation.").  And while intentional conduct, such as deliberate concealment or inaccurate reporting surely evinces a failure to cooperate, a finding of intent is not required because "inadequate inquiries" can also suffice.  *Id.* at 1383.  "While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping."  *Id.*  At bottom, a party is obligated to conduct a reasonable inquiry to investigate the accuracy of information that it submits to Commerce.  *See PAM, S.p.A v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).

Here, Commerce applied AFA to Euro SME's domestic inland freight expenses for Euro SME's reported U.S. sales transactions.  IDM, Appx2168-2171.  It found that Euro SME failed to cooperate to the best of its ability in responding to Commerce's requests for that information.  IDM, Appx2171.  From the start, Commerce notified Euro SME of major errors with its inland freight submission data.  IDM, Appx2169.  And despite clear and repeated requests by Commerce to correct noted discrepancies, Euro SME instead chose to continue to report domestic inland freight expenses that consistently did not correspond to underlying documentation on the record.  IDM, Appx2169-2170; Appx1568, Appx80555.  In fact, when asked to validate its numbers, Euro SME made no serious effort to explain how it had allocated

the charges on the freight invoices it remitted during the verification process.  Appx2169-2170.

It instead relied on vague statements and references to gloss over invoice numbers that clearly

did not reconcile domestic inland freight data that Euro SME had previously reported.  *Id.*

Ultimately, Commerce found that Euro SME appeared to have tried to mask material

discrepancies between the domestic inland freight expenses it reported and its supporting

verification documents by making vague characterizations and unsupported statements.

Appx2171.

Euro SME insists that Commerce's AFA determination was improper.  It insists that its

"cooperation was extraordinary"—emblematic of a "steadfast commitment to comply with"

Commerce's requests in "trying times."  Euro SME Br. at 2.  It calls Commerce's reported data

discrepancies "insignificant and immaterial" and claims that Commerce could have made do by

making "minor changes" to its "margin calculation programming."  *Id.* at 2-3.  But while Euro

SME makes these broad claims, it offers nothing in particulars.  It does not describe how

precisely Commerce erred.  *See* Euro SME Br. at 2-6.  It does not address the sequence of events

that caused Commerce to apply AFA.  *Id.*  It does not even specify what changes Commerce

could have made to reconcile data that is indisputably unverifiable.  *Id.*  These omissions alone

are fatal to its challenge.

The record validates Commerce's determination to apply AFA.  There is no dispute that

Euro SME's purported domestic inland freight data for its U.S. sales was problematic from the

start.  In response to relevant questionnaires asking for specific inland freight data by code,

DINLFTPU, IDM, Appx2169; Appx1132-1133, Euro SME provided sales databases (which

included that data) as well as a corresponding chart that purportedly provided a visual

representation of those same data points, IDM, Appx2169; Appx1374, Appx1482-1483,

Appx80348, Appx80457-80471.  But upon comparing these two items, Commerce found that there were clear and significant discrepancies between these two documents.  IDM, Appx2169; Appx1568, Appx80555.  Well-over one hundred data points did not align.  *See* IDM, Appx2169.

Commerce thus issued Euro SME a supplemental questionnaire.  It noted that "the shipment-specific numbers appearing in {the relevant Exhibit} do not reconcile to the amounts reported in the DINLFTPU field."  Appx1568, Appx80555; IDM, Appx2169.  Commerce asked Euro SME to explain the discrepancies, correct its reporting for DINLFTPU, and provide documentation supporting the amount it reported for a specific invoice.  *Id.*  In response, Euro SME then revised 165 domestic inland freight calculation in its U.S. sales database.  IDM, Appx2169; Appx1591, Appx80573.  It then provided a worksheet and supporting documentation purporting to substantiate these newly corrected numbers.  IDM, Appx2169; Appx1662-1663, Appx80748-80752.

But the verification process revealed that Euro SME—even after making those corrections—could not support those revised numbers either.  In a Verification Questionnaire, Commerce requested three U.S. sales trace packages, including calculation worksheets and supporting documentation for the reported domestic inland freight costs.  IDM, Appx2169; Appx1993-1995, Appx81838-81840.[7]  For each sales trace, Euro SME responded by purporting to provide a summary table and calculations regarding domestic inland freight and supporting documentation.  IDM, Appx2169; *see, e.g.*, Exhibits 1-3 (Appx2029, Appx81874, Appx81909, Appx81912; Appx2035, Appx81919, Appx81948, Appx81951; Appx2041, Appx81958, Appx81991, Appx81993).  These invoices did not support the data Euro SME had reported, and

---

[7] These U.S. sales traces covered the same three U.S. transactions that Commerce identified with respect to the other issues.  Appx1993-1995, Appx81838-81840.

Euro SME's explanations and calculations attempting to reconcile the differences were clearly results-oriented. Simply examining Exhibits 1 through 3 of Euro SME's verification questionnaire responses (cited above) proves our point. These documents were meant to encapsulate Euro SME's attempts to reconcile material inland freight expense discrepancies between numbers reported in its sales database and numbers provided in its verification responses. But in supposedly addressing these discrepancies, Euro SME simply wrote:

- ████████████████████████████████████
  Appx2179-2180, Appx82274-82275; Appx2041, Appx81874,
  Appx81909-81912.

- ████████████████████████████████ on the relevant
  summary. Appx2179-2180, Appx82274-82275; Appx2035,
  Appx81919.

- ████████████████████ Appx2179-2180, Appx82274-82275;
  Appx2041, Appx81958.

Euro SME's purported explanations do little more than instruct Commerce not to trust the face of Euro SME's own verification documents. They provide no explanation for purported adjustments or deductions it made to its own sales database numbers. They simply offer bare statements that some reported costs should not be counted because they do ██████████ or ██████████ to the very thing Commerce is required to verify. *See supra*. Nor did Euro SME identify (much less reference) any documents to support these statements. These are not the efforts of one putting forth "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*, 337 F.3d at 1382. These are the actions of a party that chose not to conduct a reasonable inquiry to investigate the accuracy of information it was reporting to Commerce. *See PAM, S.p.A*, 582 F.3d at 1339.

Worse yet, by all reasonable accounts, "it appear{ed} that Euro SME simply assigned an allocation to the selected transaction in each sales trace so that it appeared that the

documentation supported its reporting of the expense in the sales database." IDM, Appx2169-70. The math supports that assessment. "In all three U.S. sales traces," Euro SME appears to have fashioned its unexplained deductions "so that the calculation outlined in the summary page resulted in no variance between the documentation and what {it previously} reported." *Id*. But assuming that Commerce accepted those deductions, it would create widespread variances across the remainder of Euro SME's "non-selected transactions." *Id.* Euro SME, in other words, appears to have attempted to manufacture a conclusion that did not accord with reality.

These facts explain why partial AFA was appropriate. As Commerce found, "Euro SME did not provide an explanation of how it allocated the freight expenses among the various transactions covered by the freight invoices beyond vague, unexplained notes that did not actually demonstrate how the allocation was calculated." IDM, Appx2169. Commerce thus had no plausible way to determine how Euro SME arrived at transaction-specific amounts. *Id*. And Euro SME not only failed to disclose the clear discrepancies relating to its own calculations, Appx2179-2180, Appx82274-82275, it seemingly tried to cover them up by engaging in result-oriented math to make it appear "that the calculation outlined in the summary page resulted in no variance between the documentation and what {it previously} reported." IDM, Appx2169-70. Commerce thus substantiated its AFA finding, and Euro SME provides no explanation why that decision was improper.

We address one last issue. Euro SME alleges that Commerce, in applying the calculated AFA rate, "revised DINFLTPU for small discrepancies identified in the {Verification Questionnaire} response for a limited number of U.S. sales, and increased DINFLTPU by ███████ for the other sales." Euro SME Brief at 10. That is not correct. Commerce revised all of Euro SME's U.S. sale transactions by ███████ consistent with its reliance on AFA. IDM,

Appx2171 (Commerce "increased all reported domestic inland freight expenses (DINLFTPU) by the larges percent variance calculated on an exhibit-wide basis among the three U.S. sales traces."). Commerce's methods and calculations are all detailed in the record, and amply supported.[8] Although Euro SME does not appear to challenge the AFA calculation itself, it incorrectly explains Commerce's method, and we thus feel it necessary to offer this clarification.

IV.   **Euro SME Did Not Timely Challenge Commerce's Determination To Continue To Rely On Its Preliminary Method For Capping Freight Revenue And Its Challenge Is Thus Time-Barred**

Euro SME lastly brings a ministerial error challenge. A ministerial error by definition includes "errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which {Commerce} considers ministerial." 19 U.S.C. § 1675(h); *see also* 19 C.F.R. § 351.224(f).

---

[8] The AFA calculation is as follows: in attempting to verify transaction SEQU ▮▮, Euro SME provided two invoices, covering four transactions—the transaction that Commerce specified and three others. Appx82755-82757; Appx2041, Appx81874, Appx81909-81912. In order to calculate the variance between what Euro SME reported in its U.S. sales database and the amount on the relevant verification documents, Commerce (for each transaction) multiplied the actual weight (QTYKG2U), reported in Euro SME's U.S. sales database, by the domestic inland freight expense rate (DINLFTPU) reported in the same database, *i.e.*, (MYR for the same transaction, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Appx82755-82757. Commerce then totaled the product of each calculation for each transaction, resulting in ▮▮▮▮▮▮▮▮ *Id.* Next, Commerce totaled the cost on each invoice that Euro SME provided to support the domestic inland freight expense it reported in the U.S. sales database, which was ▮▮▮▮▮▮▮▮ *Id.* The difference between these two numbers signifies the discrepancy between what Euro SME reported in its database and the amounts supported by its verification documents. Finally, to determine the percentage difference, Commerce subtracted the total domestic inland freight amount for these four transactions from the total amount indicated in Euro SME's verification documentation and divided the difference by the total amount reported in the database for the same transactions. *Id.* This yielded the percentage variance for each sales trace. For the first traced transaction, described above, the calculated variance was ▮▮▮▮ percent. *Id.* Commerce then completed the same calculations for the second and third sales traces. *Id.* Then, consistent with its decision to rely on an adverse inference, Commerce selected the largest variance, ▮▮▮ percent, and adjusted the domestic inland freight expense for Euro SME's U.S. sales according to this variance. IDM, Appx2171; Appx2180, Appx82275.

While ministerial errors are "by their nature not errors in judgment but merely inadvertencies," *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995), "Commerce is entitled to 'substantial discretion in determining what types of unintentional or inadvertent errors qualify as "ministerial."'" *SGL Carbon LLC v. United States*, 819 F. Supp. 2d 1352, 1362 (Ct Int'l Trade 2012); *see Cemex, S.A. v. United States*, 19 C.I.T. 587, 593 (1995), *aff'd on other grounds* 133 F.3d 897 (Fed. Cir. 1998) ("Commerce is given fairly broad discretion to determine which types of unintentional error to regard as ministerial."); *see also Peer Bearing Co. v. United States*, 57 F. Supp. 2d 1200, 1205 ("Commerce has broad discretion to determine what constitutes a ministerial error.").

Although that is the guiding legal standard for ministerial error challenges, Commerce is not required to correct an error if the error was discoverable early in a review, such as in Commerce's preliminary disclosures, and the party alleging the error did not timely raise its allegation. *QVD Food Co. v. United States*, 658 F.3d 1318, 1328 (Fed. Cir. 2011) (holding that Commerce's failure to correct an error was not abuse of discretion because Commerce's alleged error was present in its preliminary results and the error was not pointed out until after the final results were issued); *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1376-77 (Fed. Cir. 2010) (holding that Commerce has discretion not to correct even a clerical error where the error was discoverable, but not pointed out to Commerce during the time period specified in the regulations, in its administrative case brief); and *Stanley Works (Langfang) Fastening Systems Co., Ltd. v. United States*, 964 F. Supp. 2d 1311, 1341 (CIT 2013) ("Stanley's failure to raise any ministerial allegations at the time Commerce's calculations were disclosed, {after the preliminary results,} or even in its administrative case brief, is fatal to the claim that it seeks to press here . . . 'a ministerial error made by Commerce that was reflected in its preliminary

antidumping duty determination need not be corrected by Commerce when no interested party pointed out the error in a timely manner.'"). Parties, moreover, are procedurally required to raise their issue before Commerce at the time Commerce is addressing the issue. *Dorbest*, 604 F.3d at 1375. Pursuant to 19 C.F.R. § 351.224(c)(1), comments concerning ministerial errors made in the preliminary results of a review should be included in a party's case brief. And Commerce's regulations require the presentation of all issues and arguments in a party's administrative case brief. 19 C.F.R. § 351.309(c)(2). Rebuttal briefs may respond only to arguments raised in case briefs. 19 C.F.R. § 351.309(d)(2).

A square application of the law demonstrates that Euro SME's ministerial error challenge was untimely. Here, Commerce issued its Preliminary Results in August 2021. Appx1843. In the Preliminary Results, Commerce determined movement expense variables by, in part, capping freight revenue by the amount of reported international freight. Appx2226. Euro SME did not file an administrative case brief, and it accordingly failed to timely challenge Commerce's method for capping freight revenue.[9] And because no party raised arguments about Commerce's methodology in their case briefs, Commerce continued to rely on the same methodology and calculation for determining movement expense variables in the Final Results that it did in its Preliminary Results. Appx2226.

The record establishes that Euro SME did not submit a ministerial error allegation until March 7, 2022, after the Final Results, when it argued for the first time that Commerce's

---

[9] As indicated, Euro SME did not file a case brief. The petitioners did. Euro SME then attempted to challenge the freight revenue cap methodology in its rebuttal to the petitioners' brief, even though petitioners had not raised that issue. Commerce thus rejected that segment of Euro SME's rebuttal brief on the ground that the challenge was a standalone argument and not rebutting anything petitioners had said. That determination is consistent with the law. 19 C.F.R. § 351.309(d)(2). Euro SME then filed a corrected rebuttal brief, which excluded its untimely argument. Appx2123-2148, Appx82245-82270.

methodology for capping Euro SME's freight revenue expenses was improper.  Appx2210-2215, Appx82766-82771.  As Commerce correctly found, Euro SME's ministerial error allegations were untimely because Commerce relied on the same method for capping freight revenue in both its Preliminary Results and Final Results.  Appx2226.  That determination is correct and should be sustained.

Euro SME does not address this aspect of Commerce's decision.  Instead, it urges the Court to accept the merits of its argument, claiming that the cap was fundamentally improper.  Euro SME Br. at 15-17.  But the governing law is decisive.  Any challenges regarding ministerial errors made in the preliminary results of a review should be included in a party's case brief.  19 C.F.R. § 351.224(c)(1).  And administrative case briefs must present all issues and arguments advanced by a party.  19 C.F.R. § 351.309(c)(2).  Euro SME never effectively disputed Commerce's determinations pertaining to a freight revenue cap until after Commerce issued its Final Results.  Euro SME fails to explain how Commerce's determination with respect to Euro SME's ministerial error allegation was an abuse of discretion or not in accordance with the law.  That decision should be sustained.

<u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny plaintiff's motion, sustain Commerce's final determination, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Claudia Burke
CLAUDIA BURKE
Assistant Director

OF COUNSEL:

BRENDAN SASLOW
Senior Attorney
Office of the Chief Counsel
    for Trade Enforcement and
    Compliance
U.S. Department of Commerce
Washington, D.C.


October 18, 2022

/s/ Meen Geu Oh
MEEN GEU OH
Senior Trial Counsel
U.S. Dept. of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-0184
Fax: (202) 307-0972
E-mail: Meen-Geu.Oh@usdoj.gov

Attorneys for Defendant

CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court and the

Court's scheduling order in that it contains 8,879 words, including text, footnotes, and headings.


/s/ Meen Geu Oh

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE STEPHEN A. VADEN, JUDGE

|  |  |  |
|---|---|---|
| EURO SME SDN BHD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | Court No. 22-00108 |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| POLYETHYLENE RETAIL CARRIER | ) | |
| BAG COMMITTEE, HILEY POLY CO., | ) | |
| LLC, and SUPERBAG CORPORATION, | ) | |
| | ) | |
| | ) | |
| Intervenor Defendant. | ) | |
| | ) | |

<u>ORDER</u>

Upon consideration of plaintiff's motion for judgment upon the administrative record,

responses thereto, replies, and all other papers, it is hereby

ORDERED that the motion is denied, and it is further

ORDERED that judgment shall enter in favor of the United States.


Dated: _____, 2022          _____
              New York, NY                                         JUDGE