UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN A. VADEN, JUDGE

| | |
|---|---|
| EURO SME SDN BHD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | Court No. 22-00108 |
| ) | |
| and ) | |
| ) | |
| POLYETHYLENE RETAIL CARRIER BAG ) | |
| COMMITTEE, HILEX POLY CO., LLC, and ) | |
| SUPERBAG CORPORATION, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |

**REPLY BRIEF
OF
PLANTIFF EURO SME SDN BHD**

Kelly A. Slater, Esq.
Edmund W. Sim, Esq.
Jay Y. Nee, Esq.

Appleton Luff Pte Ltd
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
(301) 649-2149

Counsel to Euro SME Sdn Bhd

Dated: December 6, 2022

**TABLE OF CONTENTS**

**SUMMARY OF ARGUMENT** ................................................................................................... 1

**ARGUMENT** ................................................................................................................................ 3

**I. DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT EURO SME DESERVES FACTS AVAILABLE TREATMENT, MUCH LESS WITH ADVERSE INFERENCES, AS A MATTER OF FACT OR LAW** ............................................................. 3

   A.  Defendant-Intervenor's Claim That Euro SME's Reported Data Were "Falsified" as a Result of "Intentional Deception" Efforts Is Not Supported by Substantial Evidence, and Should Be Rejected .................................................... 4

   B.  Euro SME Should Not Be Penalized for the Shortcomings of the ILOV Questionnaire and Response Process Used in This Administrative Review ......... 8

**CONCLUSION** ........................................................................................................................... 13

# TABLE OF AUTHORITIES

**CASES**

<u>Ellwood City Forge v. United States</u>, Slip Op. No. 22-122 (Ct. Int'l Trade Nov. 8, 2022) ..... 5, 10
<u>Novolipetsk Steel Public Joint Stock Co. v. United States</u>, Slip Op. 20-170 (Ct. Int'l Trade
   Nov. 30, 2020) ............................................................................................................... 9
<u>Zhejiang Dunan Hetian Metal Co. v. United States</u>, 652 F.3d 1333 (Fed. Cir. 2011).................... 8

**STATUTES**

19 U.S.C. § l677e(a) ............................................................................................................ 8, 9
19 U.S.C. § 1677m(d) .............................................................................................................. 9

In accordance with Rule 56.2 of the Rules of this Court, on behalf of Plaintiff Euro SME Sdn Bhd ("Euro SME" or "Plaintiff"), we hereby respectfully submit this reply brief addressing certain arguments made in the response briefs submitted by Defendant, the United States (ECF No. 25), and by Defendant-Intervenors Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., Ltd., and Superbag Corporation ("Defendant-Intervenors") (ECF No. 27)[1] (collectively, "Defendants") in the above-captioned case.

## SUMMARY OF ARGUMENT

Despite the various ways in which Defendants describe how or why the U.S. Department of Commerce ("Commerce") failed to verify certain information submitted by Euro SME in the underlying proceeding, Euro SME respectfully submits that this lawsuit serves to underscore the value of on-site verification of a respondent's reported information. This is especially the case when the manner of data Commerce requests for margin calculation purposes are not kept in such a manner by a respondent in the normal course of business, as is the case here. In the underlying proceeding, Commerce requested that Euro SME report U.S. and home market inland freight data based on <u>actual</u> weight, information which Euro SME consistently explained throughout the proceeding that it does not keep as it does not serve any meaningful purpose in its commercial transactions (and related commercial documents) or in its internal accounting records. Simply put, Euro SME just does not sell plastic bags by the pound.

---

[1] We note that, as Defendant-Intervenors adopted and incorporated by reference the issues presented for review, statement of facts, and arguments presented on behalf of Defendant, the United States, in this reply brief we principally will cite to Defendant's response brief where there are parallel arguments made in both response briefs. Please see Def.-Int. Resp. Br. at 1, ECF No. 27, for this reference.

1

Despite Euro SME's attempts to explain this, and to provide additional and alternative support for its reported data—all of which were provided in a timely and cooperative manner—Commerce nonetheless rejected these efforts and instead found them to be a basis for adverse treatment of such data in its final decision.[2] Commerce thus arbitrarily resorted to facts available treatment of Euro SME for certain reported, and so-called "unverified," data in the Final Results.

What the record evidence shows is that in Euro SME's in-lieu-of-verification ("ILOV") questionnaire response, the company did its best to comply with Commerce's reporting requirement of the actual weight of its reported sales by submitting and certifying to the accuracy of all documents that it actually had on hand which might fit the bill in order to come as close as possible to satisfying Commerce's demands. This required that Euro SME explain further its reported data in this process, again based on the documents that it had. And while in some cases the results of this exercise did not result in 100% perfect matches in the data reported versus the supporting documents available, in the end the variations were so minor so as to be immaterial, something which Euro SME also consistently explained.

Such circumstances are nothing new in Commerce antidumping (AD) proceedings. Most cases involving these kinds of issues are resolved at on-site verification through careful, direct discussions between Commerce officials and company personnel, with the assistance of counsel, when needed, to bridge any gaps in understanding about how the information was reported and why it was reported in the way that it was. In Euro SME's case, however, there was no opportunity for such discussions. Instead, Euro SME was limited to the ILOV questionnaire and

---

[2] See generally Polyethylene Retail Carrier Bags From Malaysia: Final Results of the Antidumping Duty Administrative Review; 2019–2020, 87 Fed. Reg. 12,933 (Dep't Commerce Mar. 8, 2022), Appx 2173-2175, and accompanying Issues and Decision Memorandum, Appx2158-2172 (collectively, "Final Results").[2]

the written response thereto. This unfortunately resulted in a series of facts available findings, some with adverse inferences regarding other elements of Euro SME's reported information.

Given that Euro SME thoroughly explained its reported information to Commerce in the underlying proceeding, as well as it has to the Court now, the fact remains that there is no substantial evidence in support of facts available findings for Euro SME, much less with adverse inferences. Thus, we maintain our position that Commerce's decision in the Final Results remains arbitrary and capricious, and unsupported by substantial evidence. As such, the Court should remand the Final Results to Commerce for further consideration.

## ARGUMENT

**I.     DEFENDANTS HAVE FAILED TO DEMONSTRATE THAT EURO SME DESERVES FACTS AVAILABLE TREATMENT, MUCH LESS WITH ADVERSE INFERENCES, AS A MATTER OF FACT OR LAW**

Commerce's decision to apply adverse facts available ("AFA") to Euro SME with respect to certain Malaysian inland freight data it reported in the home market and U.S. sales databases (as INLFTCH and DINFLTPU, specifically) is arbitrary and capricious, and unsupported by substantial evidence. As Euro SME has explained both before Commerce and now before the Court, the administrative record is replete with evidence that Euro SME cooperated to the best of its ability at all times in the underlying administrative review, such that adverse inferences are not warranted.[3] Euro SME's extent of cooperation was extraordinary given the unprecedented COVID-19 pandemic experienced during response preparations throughout the course of the administrative review process.[4] These circumstances notwithstanding, Euro SME's firm

---

[3] See Pl. Mem. In Support of R.56.2 Mot. for J. on Agency Record, ECF No. 23 at pdf pages 7-20 (confidential), ECF No. 24 at pdf pages 7-20 (public).

[4] See Euro SME's Rebuttal Br., Jan. 7, 2022, at 2, Appx82253 (confidential), Appx2131 (public).

3

commitment to comply with Commerce's various requests for information is clearly demonstrated on the administrative record by Euro SME's reporting of clear, accurate, complete, and timely filed data on which to reasonably calculate a company-specific margin for Euro SME. Thus, we respectfully urge to the Court to remand Commerce's facts-available decisions for further consideration, based on the more detailed reply arguments presented below.

A. **Defendant-Intervenor's Claim That Euro SME's Reported Data Were "Falsified" as a Result of "Intentional Deception" Efforts Is Not Supported by Substantial Evidence, and Should Be Rejected**

Defendant-Intervenors had argued in the underlying proceeding that there were minor discrepancies in Euro SME's reported Malaysian inland freight data reported in the home market and U.S. sales databases. In response, Euro SME openly explained the origins of those differences, and how the differences were insignificant and immaterial, only requiring minor amendments to Commerce's programming and use of information already on the record of the proceeding. The record evidence showed that the purported discrepancies did not warrant the use of partial adverse facts available, but rather could have been remedied by minor changes to Commerce's margin calculation programming by using the information already on the record of the proceeding which could fill certain evidentiary gaps.[5] We respectfully submit that those gaps could have been fully explained and digested by Commerce officials in the course of on-site verification, as is usually the case, but instead Defendant-Intervenor apparently took this as an opportunity to allege some kind of malfeasance on Euro SME's part in order to spark an adverse inference finding in the proceeding.

---

[5] See Pl. Mem. In Support of R.56.2 Mot. for J. on Agency Record at pdf pages 7-15, ECF No. 23 (confidential), ECF No. 24 (public).

4

Neither Euro SME nor its counsel take such accusations lightly. As such, we ask the Court to disregard and/or dismiss Defendant-Intervenor's allegation that Euro SME "falsified" certain sales documents in the preparation of its ILOV submission by making handwritten notes on the "loading advice" documents contained in the sales trace packages.[6] Defendant-Intervenor's allegation in this regard is not just unsupported by the evidence, but perhaps also demonstrates a fundamental misunderstanding about how the on-site verification process usually works.

Considering that the underlying, now-challenged proceeding unfortunately could not benefit from the opportunity to have on-site verification on account of the pandemic, Euro SME in the alternative gathered the documents that it determined could best express and support its reporting of actual weight data of the merchandise, to the best of its ability, based on its normal books and records—as it normally would have, in preparing for on-site verification, but in the format of an ILOV response instead. See, e.g., Ellwood City Forge v. United States, Slip Op. No. 22-122, at 28-31 (Ct. Int'l Trade Nov. 8, 2022) (discussing how Commerce has substituted ILOV questionnaire responses for on-site verification during the pandemic).[7]

---

[6] See Def.-Int. Resp. Br. at 2-4, ECF No. 27.

[7] We note that, unlike Plaintiffs in the Ellwood City case, Euro SME does not contest Commerce's use of an ILOV questionnaire as a substitute for on-site verification as inappropriate, particularly under the circumstances presented by the pandemic. Euro SME moreover agrees with Defendant that "Commerce has broad discretion and latitude in how it chooses to conduct its verification procedures." Def. Resp. Br. at 13, ECF No. 25 (confidential), ECF No. 26 (public). Rather, Euro SME's position is that the Defendants' verification-related concerns should not override or otherwise short-circuit the substantial record evidence that Euro SME provided in support of Commerce's making an accurate margin calculation using the data kept in the normal course of business, a position that the Government specifically mischaracterizes as an attempt by Euro SME to "second-guess the appropriateness of Commerce's verification process." Id.

Those with experience in participating in on-site verifications in trade remedy proceedings well know that pre-verification preparations routinely involve making notations (handwritten or otherwise) on photocopies of sales and/or other internal records highlighting reconciling figures for ease of reference and to expedite the on-site verification process. These preparation efforts are logically guided by the requirements set forth in Commerce's verification outline, issued in advance of verification and meant to expedite the verification process given the limited time available for it, on-site at a respondent's facilities. In this case, there was no verification outline but rather an ILOV questionnaire as a stand-in for on-site verification. So, if there had been an on-site verification at Euro SME, the sales trace packages requested by Commerce's ILOV questionnaire, for example, normally would have been carefully assembled and duplicated, in double or triplicate for ease of the various Commerce verifiers' reference, in advance of the verification for presentation to Commerce officials when they arrived on-site. Instead they were submitted electronically, in response to the ILOV questionnaire.

It is moreover a matter of common knowledge in this area of practice that handwritten notations are routinely made on the photocopied packages prepared in advance of on-site verification, especially when needed to direct Commerce's review of the documents, and to explain how certain information on those documents links, supports, and reconciles to the information that was reported for the record; as well as how such information links, supports, and reconciles to other documents submitted during the verification. Such handwritten notations are meant to aid in the process of achieving as smooth and efficient a verification process as possible, for all involved. And the record shows, with the now-challenged "handwritten notes" on documents submitted in the ILOV response, this is exactly what Euro SME did in the

preparation of that response given that on-site verification would not take place in the proceeding.

Despite the necessary adjustments that had to be made under the aforementioned circumstances, Defendant-Intervenors nonetheless allege that the "handwritten notes" demonstrate that Euro SME engaged in "intentional deception" of Commerce in the ILOV questionnaire response. We respectfully submit that this allegation is disingenuous, and more importantly, is entirely unsupported by the record. Describing Euro SME's handwritten notes as "filler data (*e.g.*, plugging numbers) that would <u>force</u> the numbers to reconcile for the preselected sales being examined at verification,"[8] this again demonstrates that Defendant-Intervenors lack an appreciation of the process undertaken at on-site verification where minor discrepancies are probed, discussed, and carefully resolved.

In addition, there is a fundamental problem with Defendant-Intervenor's line of reasoning in this regard: if the handwritten numbers on the "loading advice" did not in fact reconcile perfectly—and could not reconcile perfectly, based on the company's explained recordkeeping practices for the reasons that Euro SME had clearly and consistently explained, because the company does not sell or record the sales of its bags on a "by-the-pound" basis, (<u>e.g.</u>, actual weight)—then how does that serve to prove anything other than that Euro SME indeed did its best to cooperate to the best of its ability in the administrative review, based on the books and records that it keeps in the normal course of business?[9] Euro SME just does not record the actual weight of its products in the normal course of business, and the administrative record contains substantial evidence of this by virtue of Euro SME's complete and timely filed submissions.

---

[8] Def-Int. Resp. Br. at 2, ECF No. 27 (emphasis added).
[9] <u>See</u> Pl. Mem. In Support of R.56.2 Mot. for J. on Agency Record, ECF No. 23 at pdf pages 7-15 (confidential), ECF No. 24 at pdf pages 7-15 (public).

Thus the Court should dismiss Defendant-Intervenors' unsupported allegations about the "falsification" of documents, much less some sort of "intent to deceive" Commerce in the underlying process as unsupported by the evidence and based on flawed reasoning.[10]

### B. Euro SME Should Not Be Penalized for the Shortcomings of the ILOV Questionnaire and Response Process Used in This Administrative Review

The line of reasoning we present above further undermines Commerce's facts available finding with adverse inferences. Euro SME supplied plentiful data for Commerce to verify its response, but Commerce wanted Euro SME to present the data differently. Euro SME complied with this request, albeit not 100% perfectly, because its records had limits for doing so. But there were no gaps in the data, just several different versions of the data presented in different forms in accordance with Commerce's various requirements. And, whether verification took place in person or through an ILOV questionnaire response, substantial record evidence demonstrates that no data were missing.

As stated in our opening brief before the Court, the Court of Appeals for the Federal Circuit (CAFC) has explained that "under the plain language of 1677e(a), it is clear that Commerce can only use facts otherwise available to fill a gap in the record."[11] Commerce may not apply facts otherwise available "'in disregard of information of record that is not missing or otherwise deficient.'"[12] Moreover, if the conditions under 19 U.S.C. § l677e(a) are satisfied, Commerce is permitted to use facts otherwise available to fill a gap in the record, but it may not draw adverse inferences (i.e., apply AFA). Rather, before Commerce may apply AFA, both the

---

[10] See Def-Int. Resp. Br. at id., ECF No. 27.
[11] Zhejiang Dunan Hetian Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (emphasis added).
[12] Id. (quoting Gerber Food (Yunnan) Co. v. United States, 387 F. Supp. 2d 1270, 1288 (Ct. Int'l Trade 2005)).

8

conditions under 19 U.S.C. § 1677e(a) and the additional conditions prescribed by subsection 1677e(b) must be satisfied.  In other words, the conditions prescribed by 19 U.S.C. § 1677e(a) are necessary, but not sufficient, for Commerce to apply AFA.  This point has been made clear by the CAFC:  "{a}s these two subsections make clear Commerce first must determine that it is proper to use facts otherwise available before it may apply an adverse inference."[13]

We reiterate that substantial record evidence demonstrates 19 U.S.C. § l677e(a) is not applicable to Euro SME under the circumstances.  Information of record is not missing or otherwise deficient; rather, it is plentiful and was available for examination, and carefully explained albeit in electronic form and absent the usual on-site verification procedures.  Furthermore, we note that section 1677m(d) of the Statute provides that before Commerce may disregard all or part of a respondent's responses that Commerce considers to be deficient, Commerce "shall" inform the respondent of the deficiency and provide the respondent an opportunity to remedy or explain the deficiency.  Thus, if Commerce has not identified the deficiency and provided the respondent an opportunity to remedy or explain it, Commerce may not disregard a respondent's responses and apply facts otherwise available, let alone AFA.  Commerce instead must rely on a respondent's responses in that circumstance.

Under the normal circumstances of an in-person, on-site verification, Commerce does identify any discrepancies and provide the respondent opportunities to explain those discrepancies.  In the on-site verification outline that is provided to respondents, Commerce

---

[13] Id., 652 F.3d at 1346.  As the Court of International Trade recently explained, "AFA encompasses a two-part inquiry pursuant to which Commerce must first identify why it needs to rely on facts otherwise available, and second, explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when 'selecting among the facts otherwise available.'" Novolipetsk Steel Public Joint Stock Co. v. United States, Slip Op. 20-170, at 3 n.1 (Nov. 30, 2020) (citing 19 U.S.C. § 1677e(a)-(b)).

gives respondents an opportunity to correct minor errors at the start of verification. During on-site verification, Commerce officials ask questions directly to respondents' employees, assisted by counsel. Virtually all queries raised by Commerce are addressed and resolved by respondents' employees during the on-site verification through this continuous exchange of information and dialogue between Commerce and the respondents' employees.

The ILOV questionnaire and corresponding response eliminated the opportunity for any of this continuous flow of information, replacing it with a single set of written questions and a single set of written answers. What is lost is the nuance of an investigatory process. Commerce loses the ability to expand, reduce, or redirect its queries verbally with the respondents' employees. The respondents' employees lose the ability to elaborate on their responses, submit additional information, or explain why additional information either are already on the record or could be reviewed by Commerce. In a legal proceeding that necessarily involves foreign respondents, the loss of nuance inhibits the ability to account for differences in language, business operations, and legal organization, both on the part of Commerce and of the respondent.

Commerce has explained to this Court that the ILOV questionnaire and response process is a substitute for on-site verification and is supposed to correspond to the efforts that it normally would undertake in an on-site verification.[14] Yet as explained above, nothing in the ILOV questionnaire and response process can replace the direct and continuous exchange of information between Commerce and the respondent during on-site verification. This is not to say that the use of ILOV questionnaires in and of itself is objectionable; it is not, given Commerce's broad discretion concerning verification. However, the ILOV questionnaire and response are inherently stripped of nuance and context, creating more discrepancies that could

---

[14] See Ellwood City, Slip Op. 22-122, at 31.

have been addressed through direct interaction between Commerce and the respondent's employees, and in this case, escalating any minor discrepancies into ripe opportunities for misinterpretation of data and thus points of conflict.

Defendants' various musings about the motivations behind the "handwritten allocations" on the loading device documents provided in Euro SME's ILOV questionnaire response in support of supporting the actual weight figures requested serve to prove this very point. Defendant, for its part, criticizes the allocations as "results oriented, and thus useless for verification purposes" and that Euro SME provided no explanation for the allocations in the ILOV response "as to how or why it allocated weight in its handwritten notes, much less disclose the existence of any discrepancy."[15] Defendant-Intervenors, for their part, interpret the handwritten notes in a more sinister way: the notes "appear to be falsified information" and thus "suggest intentional deception."[16] Defendant-Intervenors moreover criticize Euro SME for the having the "temerity on appeal"[17] of arguing, as it actually had done on numerous occasions in the underlying proceeding, that Commerce instead use data reported based on standard weight or number of bags (rather than actual weight), as this was the data that Euro SME explained at length is the information it keeps in the normal course of business.[18] Ultimately, Defendant seems to chalk up the issue by couching it in terms of trust, stating that "Commerce turned to the 'facts otherwise available' statute—rather than trusting Euro SME's reported numbers—because the back-up information Euro SME had supplied during verification. . .did not in large part align

---

[15] Def. Resp. Br. at 12-13, ECF No. 25 (confidential version), ECF No. 26 (public version).
[16] Def.-Inv. Resp. Br. at 2-3, ECF No. 27.
[17] Id. at 4.
[18] See Pl. Mem. In Support of R.56.2 Mot. for J. on the Agency Record, ECF No. 23 at pdf pages 12-20 (confidential), ECF No. 24 at pdf pages 12-20 (public).

11

with that Euro SME previously reported."[19]  Yet the standard of review in AD proceedings is not based on considerations of degrees of trust, but rather on substantial evidence.  As such, Euro SME maintains its position that substantial record evidence supports a finding that an accurate margin calculation could have been made based on Euro SME's reported data, rather than on facts available with a degree of adverse inferences.

Euro SME thus asks the Court to consider the ILOV questionnaire and response in the underlying administrative review in this context.  In this review, Commerce's use of the ILOV questionnaire and response did not provide Euro SME with the notice and opportunity to explain and correct the minor discrepancies at issue, which would normally have been provided during the on-site verification process.  Moreover, Euro SME has explained how these discrepancies could actually be addressed by examining other information on the record of the proceeding.  Accordingly, Commerce's rejection of Euro SME's reported actual weight information and the calculations that stemmed therefrom is unwarranted and unsupportable, and should be corrected on remand.

---

[19] Def. Resp. Br. at 9, ECF No. 25 (confidential version), ECF No. 26 (public version) (emphasis added).

## CONCLUSION

In conclusion, Euro SME respectfully requests that the Court reverse Commerce's decision with regard to (1) the revisions to U.S. inland freight, (2) revisions to Malaysian inland freight, and (3) the calculation of freight revenue; or remand the decision to Commerce for further consideration in accordance with the aforementioned comments.

                                                Respectfully submitted,

/s/ Kelly A. Slater
Kelly A. Slater, Esq.
Edmund W. Sim, Esq.
Jay Y. Nee, Esq.

Appleton Luff Pte. Ltd.
1025 Connecticut Avenue, N.W.
Suite 1000
Washington, D.C. 20036
(301) 649-2149

Dated:  December 6, 2022                     Counsel to Euro SME Sdn Bhd

## CERTIFICATE OF COMPLIANCE

      The undersigned counsel at Appleton Luff Pte Ltd hereby certifies that the Reply Brief of Euro SME Sdn Bhd dated December 6, 2022 complies with the word-count limitation described in the Court's Standard Chambers Procedures.  The memorandum of points and authorities contains 3,668 words according to the word count function of the word processing software used to prepare the memorandum.

                                              Respectfully submitted,

                                              /s/ Kelly A. Slater
                                             Kelly A. Slater, Esq.
                                             Edmund W. Sim, Esq.
                                             Jay Y. Nee, Esq.

                                             Appleton Luff Pte Ltd
                                             1025 Connecticut Avenue, NW
                                             Suite 1000
                                             Washington, DC 20036
                                             (301) 649-2149

Dated:  December 6, 2022                     Counsel to Euro SME Sdn Bhd