Slip Op. No. 24-16

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| EURO SME SDN BHD, | |
| *Plaintiff*, | |
| v. | Before: Stephen Alexander Vaden, Judge |
| UNITED STATES, | |
| *Defendant,* | Court No. 1:22-cv-00108 (SAV) |
| *and* | |
| POLYETHYLENE RETAIL CARRIER BAG COMMITTEE, HILEX POLY CO., LLC, and SUPERBAG CORP., | |
| *Defendant-Intervenors.* | |

## <u>OPINION</u>

[Sustaining Commerce's Final Determination.]

Dated:  February 12, 2024

*Kelly Slater*, Appleton Luff Pte Ltd. of Washington, DC, for Plaintiff Euro SME Sdn Bhd.  With her on the brief were *Jay Y. Nee* and *Edmund W. Sim*.

*Meen Geu Oh*, Senior Trial Counsel, U.S. Department of Justice of Washington, DC, for Defendant United States. With him on the brief were *Brendan S. Saslow* and *Kenneth G. Kays*, Of Counsel, U.S. Department of Commerce.

*Daniel L. Schneiderman*, King & Spalding, LLP of Washington, DC, for Defendant-Intervenors Polyethylene Retail Carrier Bag Committee; Hilex Poly Co., LLC; and Superbag Corp.  With him on the brief was *J. Michael Taylor*.

**Vaden, Judge**: Plaintiff Euro SME Sdn Bhd (Euro SME or Plaintiff), a Malaysian manufacturer of packaging products, comes before the Court to challenge the Department of Commerce's (Commerce) 2019-2020 Administrative Review of its antidumping duty order on retail bags from Malaysia. *Retail Carrier Bags from Malaysia*, 87 Fed. Reg. 12,933 (Dep't of Com. Mar. 8, 2022). In its Motion for Judgment on the Agency Record, Plaintiff argues that Commerce's Final Results must be remanded because substantial evidence does not support its findings. *See generally* Pl.'s Br., ECF No 23. Euro SME alleges that the agency unlawfully relied on facts available to adjust the actual weight quantities in Euro SME's data. *Id.* at 7–11. It further contests Commerce's reliance on an adverse inference to determine certain inland freight expense data for U.S. sales that the agency deemed unverifiable. *Id.* at 2–3. Finally, Euro SME contends that the agency should have corrected a ministerial error that Plaintiff brought to its attention but that Commerce rejected as untimely. *Id.* at 15–17. For the reasons set forth below, Plaintiff's Motion for Judgment on the Agency Record is **DENIED**; and Commerce's Final Results are **SUSTAINED**.

## BACKGROUND

In August 2004, Commerce published an antidumping duty order on retail carrier bags imported from Malaysia. *Retail Carrier Bags from Malaysia*, 69 Fed. Reg. 48,203 (Dept. of Com. Aug. 9, 2004) (Order). The Order primarily covers the ubiquitous plastic grocery bags that help shepherd our purchases home. Commerce

published its annual notice of opportunity to request an administrative review of the
Order in August 2020.  Notice of Opportunity, J.A. at 1,003–04, ECF No. 33; *see also*
19 U.S.C. § 1675(a)(1).  In response, Defendant-Intervenor, the Polyethylene Retail
Carrier Bag Committee (the Committee), requested an administrative review of Euro
SME alleging that the company "may have produced or exported subject merchandise
that was sold into the United States at less than fair value during the period of
review."  Req. for Admin. Review, J.A. at 1,000–02, ECF No. 33.  Commerce confirmed
that it would conduct an administrative review of Euro SME's activities between
August 1, 2019 and July 31, 2020.  *Initiation of Antidumping and Countervailing
Duty Admin. Reviews*, 85 Fed. Reg. 63,081–94 (Dep't of Com. Oct. 6, 2020).

On October 26, 2020, Commerce sent a letter to Euro SME informing the
company that it was initiating an investigation into whether it had imported or
produced merchandise that was then sold in the United States for less than fair value.
Notice of Investigation at 1–4, J.A. at 1,050–53, ECF No. 33.  Commerce explained
that a failure to respond to the request for information "may result in the application
of partial or total facts available, pursuant to section 776(a) of the Act, which may
include adverse inferences, pursuant to section 776(b) of the Act."  *Id.* at 3–4, J.A. at
1,052–53.  Attached to the letter was a questionnaire, comprised of five parts, which
Commerce requested Euro SME complete as part of the review.  Initial
Questionnaire, J.A. at 1,050–1,207, ECF No. 33.  The questions reflected the type of
information the agency would need in order to conduct a comparison of Euro SME's
sales in its home market of Malaysia and the United States.

The method that Commerce used to run that analysis was the "average-to-average method." Prelim. Determination Memo at 3, J.A. at 1,845, ECF No. 33; *see also* 19 C.F.R. § 351.414(b)(1). The average-to-average method is one of the three approved methodologies for Commerce to compare subject companies' sales in their home market and in the United States. 19 C.F.R. § 351.414(b). The purpose of the comparison is to determine whether the subject merchandise is being sold in the United States for less than fair value. Of the three approved methods, the agency employs the average-to-average approach "unless [Commerce] determines another method is appropriate in a particular case." 19 C.F.R. § 351.414(c)(1); *see also Dillinger France S.A. v. United States*, 981 F.3d 1318, 1324 n.5 (Fed. Cir. 2020). The average-to-average method is conducted by "compar[ing] the weighted average of the respondent's sales prices in its home country during the investigation period to the weighted average of the respondent's sales prices in the United States during the same period." *Stupp Corp. v. United States,* 5 F.4th 1341, 1345 (Fed. Cir. 2021); *see also* 19 C.F.R. § 351.414(d)(1). To perform the calculation, Commerce must first collect the company's cost and sales data for both the home market and the United States.

Commerce sent its initial questionnaire on October 26, 2020. Notice of Investigation at 1–4, J.A. at 1,050–53, ECF No. 33. Section B focused on the data related to Euro SME's home market sales; Section C posed the same questions concerning the company's sales in the United States; and Section D inquired about the costs associated with the production of the subject merchandise. *Id.* at 1,055–57.

Initial Questionnaire Section B, C, D, J.A. at 1,080, 1,113, 1,149, ECF No. 33.  In both
Sections B and C, Commerce instructed Euro SME to report "the sale quantity for
[each] transaction" and explained that the entry should be "the quantity of the
specific shipment or invoice line" of each corresponding sale.  *Id.* at B-16, C-15, J.A.
at 1,097, 1,127.  For all the data Euro SME submitted, Commerce also required the
company to provide supporting documentation.  *Id.* at G-4, J.A. at 1,059.  On the
instructions sheet, Commerce stated that the company was to "identify all units of
measurement" used in its "narrative response, worksheets, or other appendices" and
that it must "complete Appendix VII, which is a template providing a standard format
for reporting the units of measurement, currencies, and conversion factors."  *Id.*  The
instructions also noted that "all information submitted may be subject to verification"
and that a "failure to allow full and complete verification of any information may
affect the consideration accorded to that or any other verified or non-verified item in
the responses."  *Id.* at G-9, J.A. at 1,064.

Euro SME provided timely responses to the questionnaire, submitting its
response to Section A on November 23, 2020, and to Sections B, C, and D on December
11, 2020.  Euro SME Sect. A Resp., J.A. at 80,000, ECF No. 31; Euro SME Secs. BCD
Resps., J.A. at 80,307, ECF No. 31.  In its narrative response explaining the
quantities and units of measurement for its sales data, Euro SME stated that it was
reporting both standard and actual weights in kilograms and that they included "both
for reconciliation purposes[.]"  Secs. BCD Resp. at 14, J.A. at 80,326, ECF No. 31.
Euro SME added that it "also reported quantity in cartons … and quantity in 1,000

bags[.]" *Id.*  The company provided the same narrative explanation in Section C when asked about the quantities of its sales in the United States.  *Id.* at 34, J.A. at 80,346. At oral argument, counsel for Euro SME explained the difference between the figures. "Standard weight" refers to an approximated weight of the bags "based on the thickness, the length, the width, the depth of the bag" and other metrics; while "actual weight" refers to exactly that — the weight of the bags when those bags are weighed. Oral Arg. Tr. at 18:4–8, 21:15–18, ECF No. 46.  However, Euro SME explained that the "actual weights" it submitted were not based on a literal weighing of each carton, as the definition of the term would suggest.  Instead, the company weighed a single carton from each shipment and then multiplied the weight of that one carton by the total number of cartons in the sale to arrive at the "actual weight."  *Id.* at 22:8-16. The data Plaintiff proffered as "actual weight" was therefore an average based on a random sampling rather than the actual weight of the product for each sale.

When supplying its standard weight and "actual weight" data, Euro SME did not make any objection to Commerce's request for "the quantity of the specific shipment[,]" nor did it express any concern about its ability to provide the requested data.  Sec. BCD Resp. at 14, 34, J.A. at 80,326, 80,346, ECF No. 31; *see also* Issues and Decision Memo (IDM) at 8, J.A. at 2,165, ECF No. 33 ("At Commerce's request, Euro SME reported the actual weight for each transaction even though it does not record that information during the ordinary course of business.  There was no indication in the record prior to verification that there may be an issue with Euro SME's reporting[.]").  At the end of the narrative portion of Section BCD of the

questionnaire, Euro SME provided Commerce with a series of attachments and supporting documentation.  Exhibit 1 contained Euro SME's Home Market Sales Listing, and Exhibit 8 contained its U.S. Sales Listing.  In both exhibits, it provided four measurements for the quantity of sales in the respective markets:  standard weight, actual weight, number of cartons, and per 1,000 bags.  Sec. BCD Resp. at Ex. 1, Ex. 8, J.A. at 80,396–403, 80,439–53, ECF No. 31.   On September 2, 2021, Commerce published its Preliminary Results and Preliminary Decision Memo (PDM).  *Retail Carrier Bags from Malaysia*, 86 Fed. Reg. 49,309 (Dep't of Com. Sept. 2, 2021) (Preliminary Results); Preliminary Issues and Decision Memo (Dep't of Com. Aug. 27, 2021), J.A. 1,843–53, ECF No. 33.  It calculated a dumping margin of 0.00% and concluded that "sales of polyethylene retail carrier bags … were not made at less than normal value during the period of review[.]"  Preliminary Results, 86 Fed. Reg. at 49,309.

In lieu of performing an on-site verification, Commerce sent Euro SME a verification questionnaire (ILOV) on October 21, 2021, requesting documentation to support the information the company had reported earlier, including the quantities of its merchandise sold and its freight costs.  ILOV Request for Information, J.A. at 81,836–42, ECF No. 31.  To verify the sales data, Commerce randomly selected six transactions — three from the Unites States and three from Malaysia — and requested Euro SME provide supporting documents and a narrative explanation for each transaction to verify the data that it had already submitted related to those sales.  *Id.* at 81,838–40.  To verify the freight costs, Commerce requested supporting

documentation to explain how the company recorded its freight expenses in two different selected U.S. sales and two different Malaysian sales. *Id.* at 81,840. Euro SME submitted its response on October 28, 2021. ILOV Resp., J.A. at 81,843–82,224, ECF No. 31. It stated that the attached invoices contained the quantity information in terms of the number of cartons and per one thousand bags. Another attachment, labeled "loading advice," provided "support for quantity in kilograms (actual weight)[.]" *Id.* at 3, J.A. at 81,851. The company similarly explained that another "loading advice" document contained quantity information about the relevant merchandise "with actual weight," in response to questions about its freight expenses. *Id.* at 6, J.A. at 81,854. The attachments included handwritten calculations. *Id.* at Ex. 1, 2, 3, 4, 5, 6, J.A. at 81,889, 81,934, 81,972, 82,015, 82,036, 82,061, ECF No. 31. Although the documents themselves did not explain how the weights of each sale broke down within the shipment, the handwritten calculations attempted to do so. *Id.* Once again, Euro SME did not express a concern about its ability to provide the requested information. *See generally* ILOV Resp., J.A. at 81,843–82,224, ECF No. 31. Plaintiff's counsel explained at oral argument that those loading documents were where the employee in charge of calculating the actual weight recorded the weight of each shipment. She clarified that the handwritten notations were the employee's calculations "extrapolating" from the weight of a single box in the shipment the weight of the entire sale by multiplying the weight of the box by the total number of boxes. Oral Arg. Tr. at 25:11–26:20, ECF No. 46.

For five of the six documents, the weight of the overall shipment listed on the document differed from what Euro SME had originally told Commerce in its questionnaire response. *See* IDM at 6, J.A. at 2,163, ECF No. 33; ILOV Resp. at Ex. 1, 2, 3, 4, 5, 6, J.A. at 81,889, 81,934, 81,972, 82,015, 82,036, 82,061, ECF No. 31. In those five cases, the handwritten notes attributed the entirety of the discrepancy to the sales in the shipment that Commerce was *not* spot-checking. *See* IDM at 6–7, J.A. at 2,163–64, ECF No. 33; ILOV Resp. at Ex. 1, 2, 3, 4, 5, 6, J.A. at 81,889, 81,934, 81,972, 82,015, 82,036, 82,061, ECF No. 31. For the sales Commerce was spot-checking, the handwritten numbers matched what Euro SME originally told Commerce down to the hundredth of a kilogram; but the sales Commerce was not spot-checking were off by tens or hundreds of kilograms. *See* IDM at 6, J.A. at 2,163, ECF No. 33; ILOV Resp. at Ex. 1, 2, 3, 4, 5, 6, J.A. at 81,889, 81,934, 81,972, 82,015, 82,036, 82,061, ECF No. 31; Pet'r's Case Br. at Att. 1, J.A. at 82,239–40, ECF No. 31 (chart comparing reported figures to verification exhibits).

The story was similar when Commerce tried to verify Euro SME's inland freight expenses. Commerce chose to spot-check the same six sales it used to verify actual weight, plus an additional two home market sales. IDM at 9, J.A. at 2,166, ECF No. 33. All five home market sales differed between the verification documentation and what Euro SME originally reported to Commerce. *Id.* at 10–11, J.A. at 2,167–68; Pet'r's Case Br. at Att. 2, J.A. at 82,241–43, ECF No. 31 (chart comparing reported figures to verification exhibits). Again, the verification documents attributed all discrepancies to sales Commerce was not spot-checking and

reported a perfect match for the transactions Commerce was spot-checking.  IDM at

10–11, J.A. at 2,167–68; Pet'r's Case Br. at Att. 2, J.A. at 82,241–43, ECF No. 31

(chart comparing reported figures to verification exhibits).  However, for four of the

five sales, the discrepancies were negligible and possibly attributable to rounding

decisions.  IDM at 10–11, J.A. at 2,167–68.

Euro SME declined to submit a case brief in response to the Preliminary

Results.  Def.'s Br. at 28 n.9, ECF No. 25.  However, on December 13, 2021, the

Committee sent Commerce a case brief arguing that (1) "Commerce should apply

partial adverse facts available ('AFA') as a result of Euro SME's inability to

substantiate reported sales quantities and inland freight expenses" and (2)

"Commerce should also correct a ministerial error in the preliminary margin program

by which freight revenue was double counted."  Pet'r's Case Br., J.A. at 2,097–110,

ECF No. 33.

Euro SME then submitted a rebuttal brief, arguing that Commerce had

committed a ministerial error in its freight revenue cap calculation.  J.A. at 82,244,

ECF No. 31.  Because that issue had not been raised in the Committee's brief,

Commerce "rejected that segment of Euro SME's rebuttal brief on the ground that

the challenge was a standalone argument and not rebutting anything petitioners had

said."  Def.'s Resp. Br. at 28 n.9, ECF No. 25.  On January 7, 2022, Euro SME

submitted a revised rebuttal brief focusing instead on its claim that the company

"ha[d] submitted ample and accurate information" and that "the discrepancies noted

by the Petitioners with regard to actual weight, which also affect[] Malaysian inland

freight, are small and immaterial." Pl.'s Rebuttal Case Br. at 1, J.A. at 2,130, ECF No. 33. Euro SME argued that any revisions to the Preliminary Results would be "either unnecessary or should be limited in scope." *Id.* It also asserted that, in the absence of the verifiable actual weight data that the agency requested, Commerce could have performed its calculation with the standard weight or number of bags data that the company did provide. *Id.* at 10–15, J.A. at 2,139–44.

After consideration of both parties' briefs, Commerce published its Final Results and its accompanying Issues and Decision Memo. *See* IDM, J.A. at 2,158–172, ECF No. 33; *Retail Carrier Bags from Malaysia: Final Results of the Admin. Dumping Review; 2019-2020*, 87 Fed. Reg. 12,933–12,935 (Dep't of Com. Sept. 2, 2021)*, J.A. at 2,173–75, ECF No. 33 (Final Results). The Final Results differed significantly from the Preliminary Results, most notably in the conclusion that "Euro SME Sdn. Bhd. made sales of subject merchandise at less than normal value (NV) during the period of review (POR)." Final Results at 12,934, J.A. at 2,174, ECF No. 33. Commerce concluded that there was a 6.47% weighted dumping margin. *Id.* In the accompanying Issues and Decision Memo, Commerce explained the three adjustments that it made. *See generally* IDM, J.A. at 2,158–72, ECF No. 33.

The first adjustment concerned the calculation of Euro SME's sales weight data and the discrepancy that Commerce observed when it attempted to verify the data. For those figures, Commerce decided that "it is appropriate to use facts otherwise available in relation to Euro SME's reporting of actual weight and for gross unit price and sales expenses, which are reported on a per-kilogram actual weight

basis across both the home market and U.S. sales databases[.]" IDM at 7, J.A. at 2,164, ECF No. 33. This was because "there were discrepancies between the reported actual weights and the 'loading advice' document for five of the six sales traces. Euro SME did not explain how it allocated the total weight across the transactions covered by the 'loading advice' documents." *Id.* Commerce declined to draw any adverse inference here. Despite the discrepancies, Commerce did not feel "that Euro SME [had] failed to cooperate by not acting to the best of its ability to comply with Commerce's request for information." *Id.*

The second adjustment pertained to freight costs. IDM at 9, J.A. at 2,166. Those figures fell into two categories: (1) inland freight expenses in the home market of Malaysia (INLFTCH), incurred when merchandise moved from the manufacturer to the distribution warehouse, and (2) U.S. inland freight expenses (DINLFTPU), incurred between the manufacturing plant and the port of exportation. *Id.* For each category, Commerce requested documentation to verify the figures that Euro SME initially submitted. ILOV Questionnaire, J.A. at 81,838–40, ECF No. 31. The documents it provided failed to explain how the company allocated the costs between those sales and why certain deductions appeared on the company's summary pages. IDM at 9–10, J.A. at 2,166–67, ECF No. 33. Commerce also asked for supporting documentation on two additional Malaysian sales, and Euro SME's response to that request contained the same shortcomings. In both cases, Euro SME provided handwritten notations on the supporting documents that attempted to attribute all

discrepancies in the data to sales that the agency had not selected for verification. *Id.* at 10, J.A. at 2,167.

Despite those discrepancies, Commerce once again declined to apply adverse inferences against Euro SME when filling the gaps related to home market inland freight expenses associated with the three transactions it selected for spot-checking. It explained, "[i]n the three home market sales traces, the variance between what was reported in the database and the supporting documentation is very small, and we find that the variance could plausibly be the result of rounding." *Id.* at 10, J.A. at 2,167. Commerce also found "no basis to apply facts available to [the inland freight expenses] throughout the home market database because the variances between the supporting documentation and what was reported in the database appear largely immaterial." *Id.* at 11, J.A. at 2,168. However, with regard to one of the two additional home market transactions, the agency did "find it appropriate to apply facts available to the transactions … given that the size of that variance cannot be explained by rounding, and there is no explanation regarding that variance on the record." *Id.* Though Commerce opted to apply facts available to that single sale, it once again did "not find that Euro SME failed to cooperate to the best of its ability" and therefore did "not find that the application of an adverse inference [was] warranted[.]" *Id.*

For inland freight costs for U.S. sales, however, Commerce agreed with the Committee's position and applied an adverse inference. The agency justified this because "Euro SME failed to cooperate to the best of its abilities" by (1) continuing

"to report domestic inland freight expenses that did not correspond to the underlying documentation on the record even after Commerce notified Euro SME that there were discrepancies in its reporting" and (2) not properly explaining how it allocated the charges on its freight invoices among the selected transactions.  *Id.* at 14, J.A. at 2,171.  Commerce therefore "increased all reported domestic inland freight expenses … by the largest percent variance calculated on an exhibit-wide basis among the three U.S. sales traces."  *Id.*

The third adjustment that Commerce made between the Preliminary and Final Results was the correction of a ministerial error highlighted by the Committee in its case brief.  Pet'r's Case Br. at 12, J.A. at 2,108, ECF No. 33.  Commerce agreed that, in calculating its Preliminary Results, it had "double-counted freight revenue in the calculation of net U.S. price[.]"  IDM at 14, J.A. at 2,171, ECF No. 33.  The agency corrected its mistake, replacing the gross unit price variable that was inclusive of freight revenue to one that excluded freight revenue.  *Id.*

After Commerce published the Final Results, Euro SME filed its own ministerial error allegation.  Allegation of Ministerial Error at 1, J.A. at 82,766, ECF No. 31.  Euro SME repeated the claim it originally made in its rebuttal brief, arguing that Commerce had mistakenly excluded certain logistic expenses from its U.S. freight revenue expense cap.  *Id.* at 2, J.A. at 82,767.  In its letter to Commerce, Euro SME asserted that "setting the cap at just international freight … would erroneously omit [a large percentage] of the freight costs associated with moving the product to the U.S. customer[.]"  *Id.* at 4, J.A. at 82,797.  Because Commerce had "performed the

same freight revenue cap calculation" in its Preliminary Results and Euro SME failed to raise the issue until after publication of the Final Results, Commerce rejected the allegation as untimely.  Commerce Resp. to Ministerial Error Allegation at 3–4, J.A. at 2,226–27, ECF No. 33.  Citing 19 C.F.R. § 351.224(c)(1) and 19 C.F.R. § 351.309(c)(2), it explained that the alleged error was "discoverable earlier in the proceeding" and therefore should have been raised in Plaintiff's case brief.  *Id.*  Euro SME's decision to not submit a case brief forfeited the issue.  *Id.* at 3.

The Court held oral argument on May 12, 2023.  ECF No. 39.  Plaintiff clarified that it did not challenge Commerce's use of a verification questionnaire in lieu of an on-site verification despite extensive discussion of that decision in its briefs.  Oral Arg. Tr. 7:3-22, ECF No. 46 (stating that "we do not contest the use of the ILOV … questionnaire").  The Committee confirmed that it had not filed a cross-complaint or in any other way challenged Commerce's decision to resort to facts available rather than draw an adverse inference.  *Id.* at 8:15-20.  Plaintiff's counsel also clarified that she was not challenging Commerce's inland freight calculations for Euro SME's home market sales.  *Id.* at 58:7-14 (when asked to confirm that Euro SME was "not objecting to what [Commerce] did" in calculating one of the home market freight expenses, responding "we are not.").  Finally, the parties gave their consent for the Court to consider prior administrative reviews of Euro SME despite those reviews not being

formally admitted into the record.  *Id.* at 11:7-16; *see also* 44 U.S.C. § 1507 ("The

contents of the Federal Register shall be judicially noticed[.]").[1]

On the issue of Euro SME's quantity data, however, the parties were not able

to agree on (1) whether Euro SME's standard weight submissions had been verified;

(2) whether it would have been possible for Commerce to perform its calculations with

the standard weights that Plaintiff submitted; and (3) whether there was a "gap" in

the record for Commerce to fill.  On those questions, the Court ordered the parties to

submit supplemental briefing.  ECF No. 38.

Euro SME submitted its letter brief on June 5, 2023.  Pl.'s Supp. Br., ECF No.

41.  It first asserted that its standard weights had been verified because neither

Commerce nor the Committee challenged the data.  *Id.* at 3.  Next, Euro SME argued

that the verified standard weights could have been used in Commerce's entire

calculation because the agency already used standard weights in its below cost test,

disproving Commerce's claim that "it was impossible or impractical to use standard

weights in its calculations."  *Id.* at 3–5.  Euro SME concluded that, under the Federal

Circuit's opinion in *Zhejiang DunAn Hetian Metal Co. v. United States*, Commerce

could not resort to facts available because there was no "gap" to be filled.  *Id.* at 8

(citing 652 F.3d 1333, 1346 (Fed. Cir. 2011) ("The use of facts otherwise available …

---

[1] The parties agreed that the Court could take judicial notice of the existence of prior
administrative investigations to which Euro SME had been subject, as those documents are
publicly available.    However, the full administrative records associated with the
investigations were not formally placed onto the record and are not considered in this matter.

is only appropriate to fill gaps when Commerce must rely on other sources of information to complete the factual record.")) (internal citations omitted).

The Government submitted its response on June 22, 2023. Def.'s Supp. Br., ECF No. 44. It argued that standard weight figures were not provided for all the data points that were requested and were necessary to complete Commerce's calculation. Commerce claimed that Euro SME reported its sales expenses in both the Malaysian and U.S. markets only on an actual weight basis — figures that proved to be unverifiable. *Id.* at 4. With "no other usable metrics available on the record" for those data points, the Government argued that Commerce faced a "gap" and lawfully relied on facts available. *Id.* at 5. In its brief, the Committee added that a "conversion" of all the figures to standard weights — as Plaintiff proposed — would have been impossible without "an actual quantity field," which Commerce had determined "at verification to be unreliable." Def.-Int.'s Supp. Br. at 2, ECF No. 47. With these clarifications, the Court applies the law.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over the Plaintiff's challenge of Commerce's Final Results in its Administrative Review under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c). The Court must sustain Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i). Where they fail to meet that standard, the Court must "hold unlawful any determination, finding, or conclusion found." *Id.* As this Court has articulated, "the question is not whether

the Court would have reached the same decision on the same record[;] rather, it is whether the administrative record as a whole permits Commerce's conclusion." *See New American Keg v. United States*, No. 20–00008, 2021 WL 1206153, at *6 (CIT Mar. 23, 2021). Furthermore, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

In reviewing agency determinations, findings, or conclusions for substantial evidence, the Court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). The Federal Circuit has described "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

## DISCUSSION

Plaintiff Euro SME argues that Commerce's Final Results should be remanded based on the agency's unlawful application of facts otherwise available and adverse inferences. First, Euro SME challenges Commerce's adjustment of the actual weight figures. Pl.'s Br. at 7, ECF No. 23. Second, Plaintiff claims that Commerce's application of adverse inferences to the domestic inland freight costs for U.S. sales

was unlawful. *Id.* at 10. Third, Euro SME alleges that Commerce's calculation of the company's domestic freight costs reflected a ministerial error. *Id.* at 15. Euro SME claims that it fully cooperated with the agency's requests throughout the investigation and that any discrepancies in its data were because the company does not maintain records in the form that the agency requested. *Id.* at 7; Pl.'s Reply Br. at 1–3, ECF No. 28. Euro SME further explains that the agency's decision to forego an on-site verification and instead issue a verification questionnaire hampered its ability to clarify any discrepancies. Pl.'s Reply Br. at 9–10, ECF No. 28. Nonetheless, the company does not challenge the legality of Commerce's use of a questionnaire. Oral Arg. Tr. 7:3-22, ECF No. 46. Finally, Euro SME disputes Commerce's finding that there was a "gap" in the record to fill with either facts otherwise available or an adverse inference. Though some of its figures may have contained errors, the company maintains that the same information was provided in different units of measurement and that Commerce could have used that data to complete its calculation. Pl.'s Br. at 12–15, ECF No. 23; *see also* Pl.'s Supp. Br. at 3–8, ECF No. 41.

## I.      SUMMARY

To determine whether Euro SME was selling its subject merchandise at less than fair value in the United States, Commerce conducted its investigation using the "average-to-average" method. PDM at 3, J.A. at 1,845, ECF No. 33. That method is essentially calculating and then comparing the "weighted average" of the company's home market and U.S. sales. 19 C.F.R. § 351.414(d). The data that Commerce draws

from in performing its calculation is the data that it receives from responding companies. The questionnaires that Commerce sends companies under investigation identify what data it needs and in what form. Companies that have been subject to regular administrative reviews become familiar with the types of information they are expected to keep and provide to the agency. Euro SME and its predecessor company, Euro Plastics, have been subject to regular administrative reviews since 2007.[2]

When Commerce determines that parties have failed to provide information necessary for its analysis such that information is missing from the record, federal law provides a two-part process for the agency to fill the resulting gap. *See* 19 U.S.C. § 1677e(a). First, Commerce may use "facts otherwise available" in place of the missing information if:

(1) Necessary information is not available on the record, or

(2) An interested party or any other person —

    (A) Withholds information that has been requested by [Commerce],

    (B) Fails to provide such information by the deadlines for submission

        of the information or in the form and manner requested, …

    (C) Significantly impedes a proceeding under this subtitle, or

---

[2] Although these prior administrative reviews were not formally entered onto the record, the parties agreed at oral argument that the Court could take judicial notice of them for the limited purpose of confirming Plaintiff's participation in prior reviews. Oral Arg. Tr. at 9:15–11:16, ECF No. 46; *see, eg.*, *Polyethylene Retail Carrier Bags from Malaysia: Final Results of Antidumping Duty Administrative Review 2005-2006*, 72 Fed. Reg. 44,825 (Dep't of Com. Aug. 9, 2007) *through Polyethylene Retail Carrier Bags from Malaysia: Final Results of Antidumping Duty Administrative Review 2018-2019*, 86 Fed. Reg. 22,019 (Dep't of Com. Apr. 26, 2021).

> (D) Provides such information but the information cannot be
>
> verified[.]

*Id.* Second, 19 U.S.C. § 1677e(b) permits those facts otherwise available to be chosen

with an adverse inference if "an interested party has failed to cooperate by not acting

to the best of its ability to comply with a request for information from [Commerce]."

Although § 1677e(a) and § 1677e(b) are often collapsed into "adverse facts available"

or "AFA," the two statutory processes require distinct analyses rather than the single

analysis implied by the term "AFA." Commerce first must determine that it is

missing necessary information; and, if it wishes to fill the resulting gap with facts

that reflect an adverse inference against an interested party, Commerce must

secondarily determine that the party has failed to cooperate by not acting to the best

of its ability. *See Zhejiang DunAn Hetian Metal Co.*, 652 F.3d at 1346. The Federal

Circuit has explained that acting to the best of one's ability involves using "maximum

effort to provide Commerce with full and complete answers to all inquiries in [its]

investigation." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir.

2003). It also requires companies to "take reasonable steps to keep and maintain full

and complete records" of their transactions in anticipation of Commerce's

administrative reviews. *Id.*; *see also Qingdao Sea-Line Int'l Trading Co. v. United

States*, 503 F. Supp. 3d 1355, 1371 (CIT 2021). A company that has been subject to

many investigations becomes familiar with the types of information Commerce needs,

making it more difficult to justify a failure to provide the requested information in

the manner Commerce has consistently requested it. *Compare* Def.'s Br. at 15, ECF

No. 25 (describing the number of annual administrative reviews Euro SME has been subject to and, in turn, the company's familiarity with the process), *with Nippon Steel Corp.*, 337 F.3d at 1382 (stating that "inattentiveness, carelessness, or inadequate record keeping" all constitute non-compliance and that the standard "assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken and requires that importers … take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce[.]").

In response to Commerce's initial questionnaire and each of its subsequent requests for information, Euro SME proffered timely submissions that appeared responsive. Only at verification did it emerge that the data Euro SME submitted contained errors and discrepancies. After determining that Euro SME's actual weight and inland freight data were unverifiable, Commerce was left with numerous gaps in the record. Commerce gave Euro SME opportunities to provide it with verifiable data, but Euro SME failed to do so. The agency's reliance on facts available therefore was lawful under the statute. *See* 19 U.S.C. § 1677e(a).

Commerce then had to consider whether it would go the further step of applying an adverse inference based on a finding of non-cooperation. As Commerce explained in its Issues and Decision Memo, it found that most discrepancies in Euro SME's data did not "rise to the level of warranting an adverse inference." IDM at 8, J.A. at 2,165, ECF No. 33. However, with one set of figures — the inland freight costs for United States sales — the agency found otherwise. The divergence between the

data from the company's records and its verification responses combined with an

apparent effort to mask those discrepancies constituted a "fail[ure] to cooperate"

warranting the application of an adverse inference.  *Id.* at 11–14, J.A. at 2,168–71;

*see* 19 U.S.C. § 1677e(b)(1) (allowing the drawing of an adverse inference where a

party "has failed to cooperate by not acting to the best of its ability to comply with a

request for information").  Commerce's limited finding of non-cooperation regarding

specific discrepancies in Euro SME's submission was similarly lawful.  It adequately

explained in the Issues and Decision Memo what distinguished those discrepancies

from others where it declined to apply an adverse inference.  IDM at 13, J.A. at 2,170,

ECF No. 33.  Because Commerce's actions were supported by substantial evidence,

the Court will **SUSTAIN** Commerce's determination.

## II.    COMMERCE'S RELIANCE ON FACTS OTHERWISE AVAILABLE

Under the statute, Commerce may "use the facts otherwise available" in an

administrative review if information is not available on the record or if a party

withholds requested information, fails to provide information "in the form and

manner requested," significantly impedes the review, or if the information cannot be

verified. 19 U.S.C. § 1677e(a).  The existence of a "gap" in the record, such that

Commerce must look elsewhere for the information, is a prerequisite for the use of

facts otherwise available.  *Zhejiang DunAn Hetian Metal Co.*, 652 F.3d at 1346.

Euro SME argues that none of the preconditions required by the statute are

present here because the data that the company provided, though imperfect, could

have been used to calculate the company's margins.  Pl.'s Reply Br. at 8–9, ECF No.

28; Oral Arg. Tr. at 29:6-10, ECF No. 46.  According to Euro SME, "there were no gaps in the data, just several different versions of the data presented in different forms in accordance with Commerce's various requirements" so that Commerce was not permitted to use facts otherwise available.  Pl.'s Reply Br. at 8–9, ECF No. 28.  At oral argument, Plaintiff conceded that "there's a gap on the record with regard to actual weight" but maintained that, because it provided the same information in other forms, *i.e.*, in standard weight and number of bags, "the Department could have used that information and avoided" any gap.  Oral Arg. Tr. at 29:6-10, ECF No. 46.  The Government responds that Plaintiff's unverifiable data created a gap that needed to be filled by the agency in order to complete its calculations.  *Id.* at 31:4–32:8.

Both parties reiterate these positions in their supplemental briefing.  Euro SME argues that it is in the same position as the plaintiff in *Zhejiang* and that no "gap" existed for Commerce to fill.  *See Zhejiang DunAn Hetian Metal Co.*, 652 F.3d at 1348.  The Government contests that claim, arguing that several data sets, such as sales expenses in both the Malaysian and U.S. markets, were reported only on an actual weight basis and proved unverifiable.  Def.'s Supp. Br. at 4–5, ECF No. 44.  The Government explains:

> [F]or sales expenses, Euro SME reported its relevant numbers … *solely* on a per-kilogram *actual weight* basis …. That is similarly true for the gross unit price variable, which Euro SME reported only on an *actual weight* and per carton basis …. The consistent metric unifying these sales-related variables is that Euro SME reported those expenses to Commerce using *actual weight* …. Thus, when Commerce was unable to verify the actual weight data that Euro SME had provided in support of these responses, it

> concluded that there was a gap in the record that prevented
> it from conducting its calculations[.]

*Id.* (emphasis in the original); *see also* IDM at 5–8, J.A. at 2,162–2,165, ECF No. 33.

In *Zhejiang,* the Federal Circuit held that Commerce's reliance on facts available was unlawful — despite the discrepancies in the company's records — because the data Commerce needed in verifiable form was available elsewhere in the record. Thus, the Federal Circuit held there was no "gap" to fill; the agency simply had to look elsewhere in the company's submissions to find the data it needed. *Zhejiang*, 652 F.3d at 1348. Here, as the agency explained in its Issues and Decision Memo, its reliance on facts available was a result of its inability to perform the margin calculation because of an *absence* of verifiable data.

In its initial questionnaire, Commerce requested data related to the quantities of merchandise Euro SME sold in the United States and in the company's Malaysian home market. Initial Questionnaire, J.A. at 1,050–1,207, ECF No. 33. Euro SME responded with various documents from both markets, including sample invoices and packing lists. Euro SME Sec. A Resp. at Ex. 1, 6, 7, J.A. at 80,028, 80,046–63, ECF No. 31. What the invoices reflect is that Euro SME quantifies its merchandise by the number of units (bags), the number of cartons, and the number of units in each carton. Euro SME Sec. A Resp. at Ex. 6, 7, J.A. at 80,047, 80,053, ECF No. 31; *see also* Pl.'s Brief at 8, ECF No. 23. Weight does not appear on the invoices because "Euro SME does not sell to the customer by weight in any way[.]" Pl.'s Br. at 8, ECF No. 23. However, weight does appear on the company's packing lists. Plaintiff explains that the weights that appear on those documents are calculated by multiplying the

"standard weight per carton" by the number of cartons in the sale — not by individually weighing each carton. *Id.* Standard weight therefore represents, at best, an average. Euro SME provided Commerce with actual weights, but those actual weights also were more of an average. It weighed one carton from each sale shipment and multiplied that weight by the total number of cartons in the shipment to arrive at the "actual weight." *Id.* at 10; Oral Arg. Tr. at 22:8-16, ECF No. 46. Euro SME concedes that "variations between standard weight and actual weight can result in discrepancies to some degree, since actual weights and standard weights may differ[.]" Pl.'s Br. at 11, ECF No. 23. However, the company insists that "on an aggregate basis" those discrepancies are "immaterial" and do not evince any "attempt by Euro SME to manipulate or misrepresent its reported quantity information[.]" *Id.*

Although it may be true that Commerce could have conducted its calculation with a full and verifiable dataset of either the actual or standard weight, it had neither. Instead, the agency had some data in the form of standard and actual weight and other data only in terms of actual weight, which proved impossible to verify. IDM at 6–8, J.A. at 2,163–65, ECF No. 33 (discussing which units Commerce had for each data set, and which of those data sets the agency was able to verify). No conversion ratio appears in the record, meaning that Commerce could not convert unverifiable data into a different measurement unit such as standard weight or number of bags. *Id.* at 8, J.A. at 2,165; Def.'s Br. at 14–15, ECF No. 25; *see also* Oral Arg. Tr. at 44:13–45:1, ECF No. 46. Euro SME is an experienced participant in administrative reviews. That is why it sought to proffer its data in terms of actual weight without being

prompted by Commerce:  It was the same metric requested and used in past reviews. Def.'s Br. at 15, ECF No. 25.  *Compare* Initial Questionnaire at B-16–17, J.A. at 1,097–98, ECF No. 33 (Commerce requesting quantity data without any further specification), *with* Initial Questionnaire Resp. at 14, J.A. 1,352, ECF No. 33 (Euro SME providing the data in "actual weight").  Experienced respondents are expected to maintain their books in a manner that permits Commerce to glean the necessary data for its analysis. *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  By its own admission, Euro SME failed to do so and instead sought to use averages instead of actual weights.  Oral Arg. Tr. at 25:11–26:20, ECF No. 46 (Plaintiff's counsel explaining how the "actual weights" were calculated by extrapolating from a single carton's weight rather than weighing each carton.). When Euro SME's actual weight data failed to verify, Commerce had a gap to fill.  *See* 19 U.S.C. § 1677e(a)(2)(D) (failure of information to verify permits Commerce to resort to facts available).  Because the actual weight figures proffered by Euro SME proved unverifiable and no other complete data set appeared on the record that would allow Commerce to convert the data into a consistent unit of measurement, Commerce lawfully resorted to the use of facts available to adjust the actual weight data.  IDM at 6–8, J.A. at 2,163–65, ECF No. 33.

### III.   COMMERCE'S APPLICATION OF ADVERSE INERENCES TO DOMESTIC INLAND FREIGHT COSTS FOR U.S. SALES

Under the statute, Commerce may only apply an adverse inference against a party after first determining that there is a gap in the record and then separately finding that the party has "failed to cooperate by not acting to the best of its ability

to comply with a request for information."  *See* 19 U.S.C. § 1677e(b).  The inference

that Commerce draws must be selected "from among the facts otherwise available."

*Id.*  Commerce is not required to make any determination or adjustment "based on

any assumptions about information the interested party would have provided if the

interested party had complied with the request for information."  *Id.* § 1677e(b)(1)(B).

The Government argues that Euro SME's repeated failure to provide verifiable

data for its inland freight costs associated with its United States sales justified its

application of an adverse inference under the statute.  Commerce recalls that "Euro

SME's domestic inland freight data for U.S. sales could not be verified" and that "Euro

SME had repeatedly failed to act to the best of its ability and seemingly tried to mask

material discrepancies between the figures it reported and its own back-up

documents."  Def.'s Br. at 7, ECF No. 25.  Those allegations refer to Euro SME's

response to the verification questionnaire and the supporting documents the

company offered to explain the data.  Commerce found that the figures Euro SME

offered to support its data for the randomly selected sales did not match the numbers

the company proffered in its initial questionnaire response.  IDM at 10, J.A. at 2,167,

ECF No. 33.  Though the company offered "some narrative discussion of how the

documents supported what was reported in the database[,]" that explanation "fail[ed]

to explain how the freight costs were allocated to the associated transactions[.]"  *Id.*

Commerce found that Euro SME attempted to mask material discrepancies with

handwritten notations that appeared on the attached supporting documents.  Those

notations "assigned any variance to non-selected transactions so that the selected

transaction would appear consistent with Euro SME's freight invoices[.]" *Id.*  The agency argues that the application of an adverse inference was appropriate because Commerce had sent Euro SME "clear and repeated requests … to correct noted discrepancies," and Euro SME "made no serious effort" to do so.  Def.'s Br. at 21–22, ECF No. 25.

Euro SME disputes the allegation, claiming that "the administrative record is replete with evidence that Euro SME cooperated to the best of its ability at all times in the underlying administrative review[.]"  Pl.'s Reply Br. at 3, ECF No. 28.  It insists that the circumstances surrounding the Covid-19 Pandemic, which prevented an on-site verification, deprived the company of the opportunity to participate in a process with the agency whereby "those gaps [in the record] could have been fully explained and digested by Commerce officials[.]"  *Id.* at 4.  Plaintiff argues that "pre-verification preparations routinely involve making notations (handwritten or otherwise) on photocopies of sales and/or other internal records highlighting reconciling figures for ease of reference and to expedite the on-site verification process."  *Id.* at 6.  The Government's claims that the notations are indicative of an attempt to "mask" issues in the company's data reveals, according to Euro SME, "a fundamental misunderstanding about how the on-site verification process usually works." *Id.* at 5.

At oral argument, Euro SME clarified that it did not object to the agency's use of a verification questionnaire in lieu of an on-site verification but rather wanted to highlight the inherent shortcomings of that alternative verification method.  Oral Arg. Tr. 7:3-22, ECF No. 46.  It also clarified that its primary objection to the

application of adverse inferences to the U.S. sales data was the inconsistency with Commerce's finding that other, similar discrepancies that appeared in the home market sales data did *not* demonstrate a failure to cooperate. *Id.* at 55:11-15; *see also id.* at 57:24–58:23 (responding "[c]orrect" when asked if it was true that the company highlighted the agency's action to demonstrate that "the calculations for inland freight expenses in the home market and what [they] did with domestic inland freight expenses for United States sales [were] apples to apples … and yet [were] being treated differently"). Plaintiff argues that this differential treatment — whereby one discrepancy is found not to demonstrate a lack of cooperation while a similar discrepancy with another data set warrants the drawing of an adverse inference — constitutes an arbitrary and unlawful application of adverse inferences. *Id.*

In its Issues and Decision Memo, Commerce adequately explained the basis for its differential treatment of the discrepancies that appeared in Euro SME's inland freight expenses for home market sales and the larger inconsistency that it found in the U.S. sales data. Commerce explained, "Unlike the variances relating to inland freight in the home market, which were generally very small or could be explained by rounding differences, the variance between the supporting documentation and the domestic inland freight expenses reported in the database for the three U.S. sales traces were not immaterial." IDM at 13, J.A. at 2,170, ECF No. 33. "Under the arbitrary and capricious standard, the court … determine[s] whether an agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Baroque Timber Indus. (Zhongshan) Co. v. United*

*States*, 38 CIT 448, 456 n.27 (2014) (internal citations omitted).  Here, Commerce

explained the basis for its differential treatment of the various discrepancies that

appeared in Euro SME's data.  Where discrepancies were small and could potentially

be explained by rounding, Commerce found drawing an adverse inference was

unwarranted.  IDM at 10–11, J.A. at 2,167–68, ECF No. 33.  Where the discrepancy

was larger, could not be explained by rounding, and included handwritten notations

that appeared designed to obscure the discrepancy's origin, Commerce did apply an

adverse inference.  *Id.* at 11–14, J.A. at 2,168–71.  The Court finds that Commerce

considered all relevant factors, drew a rational distinction based on the relative size

of the discrepancies, and supported its determination with substantial evidence.

Consequently, the Court will not second guess Commerce's application of an adverse

inference to the largest discrepancy within the U.S. freight expense data set.

## IV.   MINISTERIAL ERROR

The final issue for the Court's review is Euro SME's ministerial error

allegation.  Pl.'s Br. at 15, ECF No. 23.  19 U.S.C. § 1675(h) requires Commerce to

"establish procedures for the correction of ministerial errors … [which] shall ensure

opportunity for interested parties to present their views regarding any such errors."

The same statute defines a ministerial error as "an error in addition, subtraction, or

other arithmetic function, clerical error resulting from inaccurate copying,

duplication, or the like, and any other similar type of unintentional error[.]"  *Id.; see*

*also* 19 C.F.R. § 351.224(f).  Commerce's regulations implementing the statute

mandate that "[c]omments concerning ministerial errors made in the preliminary

results of a review should be included in a party's case brief." 19 C.F.R. §
351.224(c)(1). Parties may submit case briefs to the agency "30 days after the date of
publication of the preliminary results of review[.]" 19 C.F.R. § 351.309(c)(1)(ii). "The
case brief must present all arguments that continue in the submitter's view to be
relevant to the [agency's] final determination[.]" *Id.* § (c)(2). Requiring ministerial
errors that appear in the preliminary results to be raised in the party's case brief
ensures that other parties have an opportunity to respond to the allegation and that
Commerce is able to "analyze any comments received and, if appropriate, correct any
significant ministerial error by amending the preliminary determination or … the
final determination[.]" 19 C.F.R. § 351.224(e).

Euro SME declined to submit a case brief after Commerce's publication of the
preliminary results. Def.'s Resp. Br. at 28 n.9, ECF No. 25. After the Committee
submitted a brief to the agency, however, Euro SME submitted a rebuttal brief in
which it responded to issues raised in the Committee's brief and attempted to raise
for the first time its allegation of a ministerial error. *Id.*; *see also* J.A. at 82,244, ECF
No. 31. Because rebuttal briefs "may respond only to arguments raised in case briefs"
and are barred from raising new issues, Commerce rejected Euro SME's submission
and required it to resubmit its rebuttal with the ministerial error allegation redacted.
*See* 19 C.F.R. § 351.309(d)(2). Following Commerce's publication of the Final Results,
Euro SME again tried to raise its ministerial error allegation. On March 7, 2022, the
company submitted a brief alleging that Commerce erred in its Final Results by
capping the company's freight revenue expenses. Commerce had only included the

international freight expenses associated with the reviewed transactions. Euro SME Ministerial Error Memo at 2, J.A. at 82,767, ECF No. 31. Euro SME argued that it should have also included the freight expenses incurred within the United States to transport the goods to their final destination. Plaintiff's data had included those United States transportation expenses, and omitting the expenses resulted in a deceptively low expense calculation from which to compare Plaintiff's production expenses. The result is a potentially inaccurately high dumping margin. *Id.*

Commerce filed its response to the allegation on March 29, 2022, arguing that Euro SME failed to raise the issue in a timely fashion and thereby forfeited the objection. Commerce Resp. to Ministerial Error at 3–4, J.A. 2,226–27, ECF No. 33. Citing 19 C.F.R. § 351.224(c)(1) and 19 C.F.R. § 351.309(c)(2), Commerce found that parties alleging ministerial error in the preliminary results must do so in their case briefs to the agency. *Id.* at 3, J.A. at 2,226. Euro SME declined to submit any initial case brief following the agency's publication of its Preliminary Results. That left Euro SME only the post-Final Results process to raise its objection. Once again, the complaint was untimely because 19 C.F.R. § 351.224(c)(1) requires parties to raise any issues that are detectable in the Preliminary Results in their initial case briefs.

The Committee agrees with the Government that Euro SME's failure to timely raise its allegation constitutes forfeiture, but it also presents an alternative basis on which to uphold Commerce's decision. It argues that "the alleged error is not 'ministerial' in nature" but is instead "a factual and methodological question." Def.-Int.'s Br. at 10, ECF No. 27. Noting that ministerial errors can only be errors "in

addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like[,]" the Committee posits that Commerce's decision not to include certain categories of expenses cannot be a ministerial error. *See* 19 C.F.R. § 351.224(f). Methodological choices are not unintentional errors and therefore cannot be raised using the ministerial error process.

The Court agrees that the allegation was both untimely and not properly characterized as "ministerial." When faced with a similar question, the Federal Circuit has held that the inclusion or exclusion of certain figures in a calculation that are "not an arithmetic or clerical error or similar inadvertent mistake … do[] not fall within the statutory definition of 'ministerial error.'" *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1328 (Fed. Cir. 2011). In *QVD Food*, the plaintiff filed a ministerial error allegation following the publication of Commerce's Final Results, alleging that the agency had mistakenly "double counted" certain expenses in its calculations. *Id.* at 1322. On appeal, the court rejected its allegation on two separate grounds. First, the Federal Circuit held that, by failing to raise its concern regarding Commerce's calculation before the publication of the Final Results, QVD had forfeited the issue. *Id.* at 1328. "[W]hen the alleged mistake was discoverable during earlier proceedings but was not pointed out to Commerce during the time period specified by regulation," it may not be raised after the publication of the Final Results as a ministerial error. *See id.* (noting that the alleged error was "necessarily present in the preliminary results," yet the plaintiff did not object in its case brief). Second, even if QVD had not forfeited its claim, the Federal Circuit explained that the alleged error

was not ministerial. Citing the statutory definition, it held that Commerce's decision to include certain figures in its calculation "is not an arithmetic or clerical error or similar inadvertent mistake" and therefore could not qualify as a "ministerial error." *Id.*

The present case is on all fours with *QVD Foods*. Like QVD, Euro SME forfeited its allegation by opting not to file a case brief following Commerce's publication of the Preliminary Results. *See id.* (holding that, where an error is discoverable in the Preliminary Results, parties must raise it in their brief to Commerce). However, even if Euro SME had timely field its allegation, its claim would still fail because the methodological decision made by Commerce to exclude certain costs in its calculations is not "an arithmetic or clerical error or similar inadvertent mistake[.]"[3] *See id.* (holding that "methodological" choices are not ministerial errors). As both grounds support Commerce's rejection of Euro SME's allegation, the Court **SUSTAINS** Commerce's determination.

## CONCLUSION

Euro SME alleges that Commerce threw the book at it. Instead, Commerce acted with deliberation, patience, and arguably stayed its hand when it could have drawn adverse inferences more broadly against such a seasoned respondent. For the reasons set forth above, the Court **SUSTAINS** Commerce's Final Results as

---

[3] Consideration of whether the allegation made by Euro SME constitutes a "ministerial error" is resolvable as a pure question of law because the question is purely legal in nature, requires no further development of the record or any additional agency action, and it does not result in undue delay or expenditure of resources. *See Saha Thai Steel Pipe Pub. Co., Ltd. v. United States*, 605 F. Supp. 3d 1348, 1366 (CIT 2022); *see also Husteel Co. v. United States*, 426 F. Supp 3d 1376, 1382 n.5 (CIT 2020).

supported by substantial evidence.  Euro SME's Motion for Judgment on the Agency

Record is **DENIED**.


                                           Stephen Alexander Vaden, Judge


Dated: February 12, 2024
       New York, New York